PEARL MAYBEE, RESPONDENT, v. MISSOURI ORPHEUM CORPORATION, APPELLANT.—181 S. W. (2d) 771.

Kansas City Court of Appeals.   June 5, 1944.

538

*Paul C. Sprinkle, William F. Knowles* and *Sprinkle & Knowles* for appellant.

*Madden, Freeman, Madden & Burke, William K. Atwood* and *W. B. Brewster* for respondent.

CAVE, J.—This is an action for the recovery of damages for personal injuries suffered by respondent, a patron of defendant's theater, by reason of her being thrown to the floor when her foot was caught under a raised or cupped-up carpet edge as she attempted to leave her seat in the theater. Trial to a jury, verdict and judgment for $4500. Defendant appeals.

But two assignments of error are made: (a) The court erred in refusing to sustain appellant's demurrer at the close of all the evidence because "plaintiff failed to introduce any evidence showing that appellant had either actual or constructive knowledge of the presence of the loose or cupped-up condition of the carpet prior to plaintiff's fall, so that the appellant could have had an opportunity by the exercise of ordinary care to have remedied the alleged defect *or warned the plaintiff of the same;*" (Italics ours); (b) error in giving plaintiff's Instruction A.

The petition alleged different grounds of negligence but the only one involved on this appeal is the failure of the defendant to warn of a danger of which it knew or, in the exercise of ordinary care, could have known. In ruling the question of whether the demurrer should have been sustained, we must consider all the evidence in the most favorable light to plaintiff, and give her the benefit of all reasonable inferences to be drawn therefrom.

The record discloses that on October 12, 1940, defendant operated a picture theater in Kansas City and on that evening the plaintiff was a patron of said theater. She and her husband purchased tickets and went to the balcony. When they reached the balcony they entered an aisle which was about four feet in width and was carpeted and runs from the south to the north. The picture screen is on the west end of the theater so that patrons sitting in their seats faced the west. From the aisle that runs south to north there are other aisles that lead to the east and upward. The aisles that lead to the east and up are carpeted and are a series of steps with seats to the right and

left of each step upward, except at the point where a patron leaves the main aisle. At that point there are four steps up before the patron reaches the first row of seats.

We are here concerned with aisle No. 2, counting from the south wall of the theater. When plaintiff and her husband reached the main aisle in the balcony they were met by one of defendant's ushers, Floyd Mock, who was equipped with a flashlight and, according to the testimony of defendant's assistant manager, it was his duty to conduct patrons to their seats and, among other things, "to be on the lookout for any defects there might be . . . and to warn . . . if he happens to see a defect." Mock, while taking plaintiff and her husband to aisle No. 2, preceded them by three or four steps and walked up the steps of aisle No. 2 in advance of them, stopped in front of the first row of seats on the north side of that aisle and directed his flashlight on the floor of the entrance to the aisle. Plaintiff's husband testified that the usher had reached a point in the aisle opposite the first row of seats and was standing facing north with his flashlight directed "right on the entrance of the row," when plaintiff and her husband started up the steps. That when she got within "about a step and a half of him" he stepped up and back and raised the flashlight some "so it would be flashed over her as we entered the row, and shone his light in the center of that first row." Concerning the same matter the plaintiff testified that as she walked up the steps to where Mock was standing he stepped up to another step and "raised the light indicating the seats he wanted us to take." She and her husband seated themselves in about the fourth and fifth seats from the south end of the first row. There were no other patrons in that row of seats.

In front of them was an iron railing to prevent anyone from falling from that position into the main aisle some three or four feet below. From photographs it appears that patrons entering as plaintiff did would leave the main aisle and walk up three steps to the east then turn facing north and take one step up into the aisle or passageway between the first row of seats and the iron railing. The carpet covering the steps upward laps or extends over into the passageway in front of the seats some eight to ten inches, the balance of the passageway is not carpeted. The carpet was about one-half inch thick. About ten minutes after plaintiff and her husband were seated, they decided to move and plaintiff walked along the passageway between the seats and the railing and facing south. She testified that, as she undertook to step into the aisle running east and west, ". . . just as I got there ready to step out into the aisle my foot caught on this rug and I immediately fell right down." In further explanation of the cause of her fall she said, "my foot just went under something and it caught and caused me to fall, that's all. . . . My foot caught under the rug on the floor. . . . Q. Could you feel your foot go under something? A. Yes. Q. Could you give us any idea how far under

the rug it went? A. Well, just over the toe of my shoe, you know, oh, an inch or two I would say. . . . Q. At the time you fell you did not know what caused you to fall? A. Oh, sure, I knew my foot caught on something on the floor. Q. Did you arrive at that by the process of sensation? A. I could feel it. . . . A. Could you tell what your foot was under? A. It was under the rug that was on the floor. Of course I couldn't see it." She was preceding her husband. He testified that "she just plunged head first, you might say, out into the aisle."

She was assisted to a restroom where help was called and it was discovered she had lost something from her purse and her husband and Mock returned to the scene of the accident to search for the article. Mock directed his flashlight on the floor and steps. The husband testified that at that time he observed that the carpet was cupped-up about two and one-half to three inches high and of about the same width. That this cupped-up place was at the north edge of the carpet which overlapped into the passageway along which plaintiff was walking at the time her foot caught and caused her to fall. Mock denied there was any such cupped up place. He did admit that he conducted the plaintiff and her husband to their seats and that he used his flashlight in directing them into the aisle leading to their seats and that a person could see the condition of the floor and carpet better when using a flashlight than without one and that when he used his flashlight he "could see around the very edges" of the carpet. He also testified that he had conducted other patrons to seats immediately adjacent to aisle No. 2, and in doing so had to pass up and down the steps where plaintiff fell; that he had conducted such patrons there just prior to the time plaintiff and her husband arrived and also after they had been seated and before they left their seats and plaintiff fell.

The carpet was new and had been laid some two or three months prior to the accident. There was no direct evidence as to how long this cupped-up condition had existed. The carpet layer testified that the carpet where plaintiff fell was nailed down with about fourteen sixteen-ounce tacks which were from five-eighths to seven-sixteenths of an inch long, and that they would not come loose. An experienced carpet layer testified on behalf of plaintiff that he examined the place involved and found no evidence that the carpet had been nailed down on the east and west side but had been folded under. Also that tacks of the size above mentioned were too small and would pull loose.

The theater was lighted about the usual way, semi-darkness. That is why defendant, and such other operators, have ushers equipped with search lights to conduct patrons to seats and to inspect the passageways for any condition which would be dangerous to patrons entering or leaving the theater.

It is not within our province to reconcile the conflict in the testimony or to pass on the weight thereof. We are only concerned with the question of whether there is substantial evidence in the record to authorize a submission to the jury. Other evidence will be considered in a further discussion of the applicable law.

Appellant cites many authorities to support the general proposition that before a plaintiff can recover from a property owner by reason of an alleged defect in the property, which is not a structural defect, the plaintiff must prove that the defendant had knowledge of the defect, either actual or constructive, in time so that the defect could have been remedied *or plaintiff warned of its presence before the injury.* (Italics ours.) A multitude of cases announce that general principle and we need cite only a few. [See Robinson v. Great Atlantic & Pacific Tea Co., 147 S. W. (2d) 648, 347 Mo. 421; McKeighan v. Kline's, Inc., 339 Mo. 523, 98 S. W. (2d) 555; State ex rel. Trading Post Co. v. Shain, 116 S. W. (2d) 99, 342 Mo. 588.]

A careful study of these cases will reveal that there are different facts and circumstances which will support an allegation that the property owner had knowledge, either actual or constructive, of the dangerous condition. Such as proof of actual knowledge of an employee; or evidence that a dangerous condition had existed for a sufficient length of time that knowledge is imputed to the owner; or where an employee, whose duty it is to observe and inspect conditions of the property, has recently been over or by the place where the dangerous condition exists, and by the use of ordinary care, could have seen and observed its condition in time to have warned invitees of such danger. [Lewis v. National Bellas Hess, Inc., 152 S. W. (2d) 674, 677.] There are other facts and circumstances which would impute knowledge to the property owner, but the above are sufficient for a discussion of this case.

Plaintiff's theory in the trial court and here is that defendant's employee Mock was charged with the duty of conducting patrons to their seats and to inspect and observe conditions of the floors and aisles to learn of any condition which might reasonably be expected to be dangerous to patrons and to warn of such condition; and that the evidence is sufficient to at least charge defendant with constructive knowledge of the dangerous condition of the carpet. Defendant argues at some length that there is no testimony in the record that the carpet was cupped-up before the plaintiff fell for a long enough period for the defendant "to have remedied the defect." It is correct in that assertion but it does not follow that plaintiff failed to make a submissible case, because if defendant had knowledge, actual or constructive, of the dangerous condition at the time plaintiff went to her seat, it then became the duty of defendant *to warn* her of such condition, and the matter of reasonable time to make repairs is of no importance.

The evidence is sufficient for the jury to find that the carpet was cupped-up at the time plaintiff entered this particular aisle. We say that for the reason plaintiff and her husband testified, in addition to above facts, that no one entered or passed through that aisle after they took their seats and before she fell; that as she was leaving her foot caught *under the carpet*; and that when her husband returned to the scene, within a very few minutes, he saw the cupped-up place. These are facts from which such an inference can be drawn. It is true she used the expression on two or three occasions that her foot caught *on* the carpet but when she explained how the accident occurred, she was clear and emphasic that her foot *caught under the carpet.* In other words, the inference is not supported *alone* by what the husband subsequently discovered, and the cases cited by defendant along that line are not controlling.

The next question for consideration is, does the record supply substantial evidence that the defendant knew or, by the exercise of ordinary care could have known of such condition, in time to have warned plaintiff thereof? We think so. It was part of the usher's duty to inspect the aisles through which patrons must pass and to observe any condition which might reasonably endanger their safety. He was thoroughly familiar with the aisles, the steps and the carpet and the manner in which it was laid, because he testified that, when he was getting his instructions and rehearsing for his work, he observed the laying of the carpet. According to the evidence he flashed the beam of his searchlight directly on the entryway where plaintiff later tripped and fell; and that he was facing north, or in the direction of the dangerous condition when he so flashed the light. Defendant says there is no evidence where his eyes were focused at that time. But it must be assumed he was using ordinary care in the performance of his duties and was looking to see that the passageway was clear and safe for patrons to enter. Not only did he seat the plaintiff and her husband, under the circumstances above detailed, but he had also conducted other patrons to seats immediately off of aisle No. 2 just prior to the time plaintiff was injured. Plaintiff's husband testified that when he and Mock returned to the scene to look for the lost article he could and did see the cupped-up condition when Mock directed the flashlight on the entrance. If he could see such condition, it must be assumed that Mock could also see it.

We are of the opinion that from all the facts and circumstances detailed in evidence, Mock, by the use of ordinary care, could have seen the condition of the carpet in time to have warned plaintiff of such cupped-up condition. Such knowledge, actual or constructive, will be imputed to the defendant. If he saw the cupped-up place or, by the exercise of ordinary care could have seen it, then it was his duty to warn plaintiff of such condition; and the question as to how long such condition had existed, or whether the defendant had time

to repair it, is of no importance. His duty was to warn. Superior knowledge of the property owner is the very basis of liability in this kind of cases. [Summa v. Morgan Real Estate Co. (Mo.), 165 S. W. (2d) 390.]

The proprietor of a picture theater, which must be kept in semi-darkness, must use that degree of care which is reasonably adapted to the circumstances; ". . . care commensurate with the particular condition and circumstances involved in the given case. . . . A paying patron of such place is not required to make a critical examination of the premises to determine their safety but may assume that proper precaution has been taken for the safety by those in charge. . . ." [Brown v. Reorganization Investment Co., 166 S. W. (2d) 479.]

It is well to keep in mind that the cupped-up condition of the carpet would in no way interfere with plaintiff entering the aisle and proceeding northward because the *mouth* of the cupped condition was to the *north* and would only interfere with a person who was walking southward in the aisle as plaintiff was. It was a one-way hazard. We conclude the evidence is sufficient to submit to the jury the question of defendant's knowledge, through Mock, of the dangerous condition.

Defendant argues that verdicts cannot stand when founded on speculation and conjecture, and that inferences cannot be built on inferences to support a verdict. Such general propositions are well and universally recognized. But, from what we have said above, such cases have no application to the present situation. It is well recognized that any number of inferences may be drawn in a given case so long as each has a factual foundation. The same fact may raise several concurrent inferences. [State ex rel. Mulcahy v. Hostetter (Mo.), 139 S. W. (2d) 939.] Without repeating the evidence, it seems clear to us that certain *facts* were proven which support the inference that the cupped-up condition existed prior to the time plaintiff entered the theater; and other *proven facts* which support the inference that defendant's agent, Mock, saw, or, by the exercise of ordinary care could have seen, such dangerous condition in time to have warned the plaintiff.

We think the demurrer was properly overruled.

Defendant also complains of error in the giving of plaintiff's Instruction A, "because said instruction informed the jury that the plaintiff could recover by reason of catching her foot under a loose carpet in appellant's theater whereby the plaintiff was caused to fall and injure herself, which instruction permitted the jury to find that the appellant had knowledge, either actual or constructive, of said condition when as a matter of fact there was no evidence of any kind in the case from which the jury could infer such knowledge. Said instruction therefore gave the jury a roving commission and was broader than the proof." From what we have said *supra,* there is no

merit in this contention. Among other things, the instruction required the jury to find that it was the duty of Mock "to exercise ordinary care to know the condition of the passageway through which plaintiff was to walk in passing to and from said seat and to warn plaintiff of any condition she might encounter in so walking. . . ." And that the defective condition of the carpet and the danger thereby created "were known or in the exercise of ordinary care could have been known to defendant, acting by and through said Mock." Since we hold there was substantial evidence of a defective condition and that the defendant was charged with knowledge in time to have warned plaintiff, we can see no justifiable basis for the criticism leveled at the instruction.

Finding no prejudicial error, the judgment should be affirmed. It is so ordered. *Bland, P. J.,* concurs; *Dew, J.,* not sitting.