Dorothy AKERS, Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant.

No. 49560.

Supreme Court of Missouri,
Division No. 1.
July 8, 1963.

Motion for Rehearing or for Transfer to Court En Banc Denied Sept. 9, 1963.

James Ruddy, St. Louis, for appellant.

Morris A. Shenker and Frank B. Green, St. Louis, for respondent.

HOLLINGSWORTH, Judge.

Plaintiff's husband, Clarence Akers, was killed when an automobile driven by him was struck by defendant's motor bus at the intersection of Twenty-first Street and Washington Avenue in the City of St. Louis. Defendant denied liability. Trial of this action, brought under the wrongful death statute, resulted in a verdict and judgment in her favor for the sum of $15,-250, from which defendant has appealed. The amount in dispute, exclusive of costs, exceeds $15,000. Jurisdiction of the appeal is, therefore, vested in this court. Article V, § 3, Constitution of Missouri, V.A.M.S.; § 477.040 RSMo 1959, V.A.M.S.

The first contention here made is that the court erred in denying defendant's motion for a directed verdict filed at the close of all the evidence and in thereafter denying its motion for judgment in accordance with its priorly filed motion for directed verdict for the reason that there was not sufficient evidence to support the verdict returned in favor of plaintiff under plaintiff's given Instruction No. 1. That instruction submitted, as the only ground of recovery upon which plaintiff went to the jury, defendant's negligence under the humanitarian doctrine in failing to stop its bus after having become chargeable with notice that plaintiff's decedent was in a position of imminent peril.

The collision occurred on April 29, 1960, at approximately 5:30 p. m., on a clear, dry day, at which hour it was still daylight. Mr. Akers was driving his automobile southwardly on Twenty-first, a north-south street, which intersects Washington Avenue, an east-west street. Washington is 60 feet wide from curb to curb, marked with white lines along its center. There are three westbound traffic lanes north and three eastbound traffic lanes south of these

white lines. Twenty-first is 36 feet wide from curb to curb north and south of Washington. A multi-story building is located on the northeast corner of the intersection of Twenty-first and Washington. The sidewalk on the north side of Washington is 9 feet wide; on the east side of Twenty-first it is 12½ feet wide. A stop sign for southbound traffic on Twenty-first stands in the west curbline of Twenty-first 11½ feet north of the north curb of Washington. There is no stop sign for traffic moving along Washington at its intersection with Twenty-first.

David Bevel, called as a witness in behalf of plaintiff, testified: Aged 38 years, he is and was on April 29, 1960, employed by defendant as a bus operator, on which date he operated the bus that came into collision with the automobile driven by plaintiff's decedent in the intersection of Twenty-first and Washington. It was the witness' last "run" for that day. The bus driven by him was a Crystaliner, more modern than the other buses operated by defendant. It was 8 feet wide, 40 feet long; the windshield was 4½ feet in height and 8 feet in width. There was a 30-mile speed limit on Washington at the point here involved. He approached Twenty-first Street in the center lane of westbound traffic at a speed of 20 miles an hour. There was no traffic in front of or alongside him to interfere with his front or lateral view. He first saw the automobile that became involved in the collision when the front of the bus was back about 15 feet from the east curbline of Twenty-first. The automobile was then 8 to 10 feet north of the north curbline of Washington, moving about 20 miles per hour and it continued into the intersection at that speed. The witness swerved the bus, blew its horn, and applied his brakes but could not avoid the collision. The right front of the bus struck the left front fender and left front end of the automobile. The collision occurred near and a few feet north of the center of the intersection. At time of collision the automobile was travelling about 20 miles and the bus 15 miles an hour. Travelling at 15 miles an hour, the bus, under conditions here shown, could be stopped (including reaction time) with safety to the operator and the passengers thereon in 45 feet; at a speed of 20 miles per hour in 60 feet; at a speed of 25 miles per hour in 75 feet; at a speed of 30 miles per hour in 90 feet. In other words, the safe stopping distance (including reaction time) of a bus of the kind and model such as involved in this collision can be computed in feet by multiplying its speed mileage per hour by three.

Mrs. Norma Bixler, called as a witness for plaintiff, testified: She, homeward bound from her employment, boarded the bus at Eighth and Washington and, holding on to a vertical rod affixed to the inside of the bus, stood facing west alongside the front seat facing the aisle. As she thus stood, she looked forward through the windshield. Her view was unobstructed. She saw the Akers' car as the bus approached Twenty-first Street. It was then a few feet north of the north curb of Washington, "easing" out into Washington, at a speed of about five miles an hour. The bus was then about a half block from Twenty-first Street, in the center lane of westbound traffic, travelling 30 to 35 miles an hour. She continued to watch the Akers' car but did not know whether it changed its speed. She saw the collision. The right front of the bus struck the left front fender of the Akers' car near its front end, the car door was thrown open, and the man in it was thrown out of the car and under the bus. She could feel the bump when the rear wheel of the bus ran over his body.

On cross-examination, Mrs. Bixler testified: The automobile was moving into the street (Washington) at approximately five miles per hour. She did not recall having been asked the questions at the first trial of the case, as read to her by counsel for defendant:

"Question: 'Let's go back to when you first saw the car. How fast was it going then?' Your answer was: 'I

could not say.' Question: 'Pardon me?' Answer: 'No one could judge that speed unless you were standing on the corner where you could be there to see the car that close.' Question: 'So you don't know that, is that correct?' Answer: 'That's right.' Question: 'So the speed you actually know is the speed of the automobile at the time of the collision?' 'At the time of the collision'"

\* \* \* \* \* \*

"Q. Well, did you testify to those facts and statements. A. Yes, I did.

"Q. So last April, you testified you did not know the speed of the automobile when you first saw it, is that correct, ma'am? A. Yes, sir.

"Q. And today, it is your testimony that it was going about five miles an hour? A. I said it was moving into the street slowly, and then approximately at five miles per hour."

Her further testimony on cross-examination was: The block between Twentieth and Twenty-first Streets is approximately 400, 450 feet. The bus was a half block or more, a minimum of 200 feet, from the intersection when she first saw the automobile. A remark made by a girl friend riding with her as to the speed of the bus caused her attention to be drawn to the automobile. The bus was then proceeding 30 to 35 miles an hour. She continued to watch the automobile and the bus continued at 30 miles an hour. The automobile had stopped before it moved into the street. She did not remember whether it was moving when she first saw its front bumper and part of its hood around the corner. That was when the bus was a half block away. The bus continued on. She was "pretty" sure that the automobile started from a dead stop. The bus was still a half block away and travelling at 30 to 35 miles an hour when she first saw the automobile. The collision occurred in the intersection just about the center line of Twenty-first Street.

On redirect examination, Mrs. Bixler testified: When the automobile started to pull out, the bus was halfway or more down the block. On recross-examination, she testified: When she first saw the automobile, it looked like it had been stopped and was moving slowly, but she could not say exactly whether it was stopped when she first saw it back two or three feet from the intersection. On further redirect examination, she testified: When the front end of the automobile got out where its front end crossed the north curbline of Washington Avenue, the bus, at that time, was a half block or more east of the intersection. On further recross-examination, she testified: When she first saw the automobile it looked like it was moving slowly into the street but she could not say for sure—did not actually know—whether it was then moving. On further redirect examination, she testified: When the automobile was moving across the (north) line of Washington, the bus was almost a half block east of the intersection.

The evidence adduced in behalf of defendant tended to show that the automobile operated by plaintiff's decedent approached and, without stopping, entered and traversed Washington Avenue to the point of collision at a rate of speed, as variously estimated by several of defendant's witnesses, of 20 to 40 miles per hour; and that the bus approached and reached the point of collision at a speed of from 15 to 30 miles per hour.

Defendant says that the submissibility of plaintiff's case rests solely upon the testimony of Mrs. Bixler. That assertion is not entirely correct. Plaintiff's case depends in part upon the testimony of defendant's bus driver, Bevel. His testimony as to the distance in which the bus, proceeding at the several rates of speed therein by him enumerated, could be stopped has a direct bearing upon the submissibility of her case. In that connection, it is well to note, as stated in Burr v. Singh, 362 Mo. 692, 243 S.W.2d 295, 299: "And we are not treating with a case where a plaintiff has relied upon the testimony of one witness to

prove an essential element of plaintiff's case, and the witness testifies directly and definitely one way. In such a case the plaintiff may not have the jury disregard his only direct evidence as to the essential fact and find the fact is exactly the opposite on the basis of inferences from circumstances also stated in the testimony of the same witness. [Case cited.] 'If A. put B. on the stand, and prove by him a certain state of facts, this does not preclude A. from putting C., D. or E. on the stand, and proving a different state of facts; but if A. puts B. on the stand as his only witness to prove a fact, and does prove it, then he is precluded from impeaching B., or from otherwise inviting the jury to disregard B.'s testimony.' Rodan v. St. Louis Transit Co., 207 Mo. 392, 105 S.W. 1061, 1066." See also Kickham v. Carter, Mo., 314 S.W.2d 902, 905.

Defendant does not challenge the law as therein stated. Its contention is that it was essential to plaintiff's case that she produce substantial evidence of the location and speed of the automobile when the bus approached and entered the intersection; that if the direct testimony of Mrs. Bixler be taken as true, then "[u]nder such evidence a humanitarian case on failure to stop could be calculated." And, further: "If the automobile was *moving* at the time the bus was one-half block away then the jury could have found that 'thereafter' plaintiff came into imminent peril. However, if the automobile was *stopped* at the time the bus was one-half block away then the plaintiff has failed to place the position of the bus at a time when the automobile *commenced* to move out into the intersection. The location of the striking vehicle at the time peril arose is an essential element in making a humanitarian case on failure to stop as submitted under Instruction No. 1." Defendant then insists that Mrs. Bixler's testimony, considered in its entirety, "leaves the point of the location of the striking vehicle when imminent peril arose in doubt" ; and that "plaintiff cannot permit the jury to speculate on the question of whether plaintiff's

deceased came into a position of peril when the bus was 225 feet away or 15 feet away. If plaintiff's deceased was going five miles per hour when the bus was 225 feet away, then at some point he could come into a position of peril. However, if the automobile was *stopped* when the bus was 225 feet away, then the jury cannot speculate on the position of the bus when plaintiff's deceased *started* up from a stopped position. Obviously, the plaintiff must show that the auto came into a position of imminent peril at a time when the driver of the bus could still stop and thus avoid the collision." (Emphasis that of defendant's counsel.)

Defendant relies upon the general rule stated in Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, 647: "Where a party relies on the testimony of a single witness to prove a given issue, and the testimony of such witness is contradictory and conflicting, one version thereof tending to prove the issue, the other tending to disprove it, with no explanation of the contradiction, and no other fact or circumstance in the case tending to show which version of the evidence is true, no case is made, and the jury should not be permitted to speculate or guess which statement of the witness should be accepted. On the other hand, if, in such a case, the conflicting and contradictory statements of the witness are reasonably explained, or if there are other facts and circumstances in the case tending to show which story of the witness is true, and from a fair consideration of all the facts and circumstances in evidence a jury could reasonably determine which statement of the witness should be accepted as true, then the credibility of the witness and the weight to be given to his testimony are questions for the jury."

■ Mrs. Bixler's testimony, taken literally, is conflicting as to whether, when she first saw the automobile, it was stopped or moving. However, except to the extent that conflicting statements made by her in that respect could affect the credibility of the remainder of her testimony, it is im

material whether the car moved into Washington from a stopped position taken just prior to entering or whether it moved into Washington without stopping. The material facts are the location and speed of the bus when the car came into a position of imminent peril; when and where the bus driver, in the exercise of the highest degree of care, became chargeable with knowledge of that fact; and whether thereafter, in the exercise of the highest degree of care, he at that time and with the means at hand, could with reasonable safety have stopped the bus in time to have averted the collision. As to those facts, there is no uncertainty in Mrs. Bixler's testimony that when she first saw the automobile, it then or immediately thereafter was "easing" out into Washington, at which time defendant's bus was almost one half the length of a 400-to-450-feet-long block east of and approaching the intersection at a speed of 30 miles an hour; and that the bus, proceeding at 30 to 35 miles an hour, the speed of which remained undiminished, collided with the automobile near the center of the intersection, at which moment the automobile was travelling at five miles an hour. Unless that testimony, viewed in the light of all of her testimony, is so shot through with contradiction as to render it valueless, its probative weight and value is for the jury. Dawson v. Scherff, Mo., 281 S.W.2d 825, 830. We are convinced that Mrs. Bixler's testimony, considered in its entirety and viewed in the light most favorable to plaintiff, reasonably supports a finding by the jury that plaintiff's decedent came into a position of imminent peril as his automobile, travelling at a speed of approximately five miles an hour, "eased" into Washington Avenue, of which said peril defendant's bus operator, in the exercise of the highest degree of care, then and there became chargeable with knowledge; and that at said time defendant's bus was being operated westward at a speed of 30 miles per hour on Washington at a point "almost" 200 feet east of the intersection, and could have been stopped (including reaction time) with safety; that defendant was, therefore, negligent; and that its said negligence, in whole or in part, directly caused the collision and plaintiff's decedent's death. Indeed, defendant's counsel concedes the validity of such a finding, once Mrs. Bixler's testimony is determined not to be so conflicting as to be self-destructive. The evidence made a submissible case of defendant's negligence as hypothesized and submitted under plaintiff's Instruction No. 1.

■ Defendant's next contention is that plaintiff's verdict-directing instruction No. 1 improperly assumed the controverted fact that plaintiff's deceased came into a position of imminent peril and improperly assumed the controverted fact that defendant was negligent. The instruction, in material part, reads:

"* * * [A]nd if you find that Mr. Clarence Akers was operating his 1950 Pontiac automobile southwardly on 21st Street and entering Washington Avenue; and if you find that a collision occurred between said westbound motor bus and said southbound automobile within the intersection of Washington Avenue and 21st Street, and that prior to such collision Mr. Akers and the automobile being operated by him were in a position of imminent peril and danger from a collision between the said southbound automobile and the said westbound motor bus; and if you find that defendant's bus operator in charge of operating said motor bus saw, or by the exercise of the highest degree of care could have seen the deceased, Clarence Akers, and the automobile operated by him in the said position of imminent peril and danger of being struck and collided with by said motor bus, if you so find, in time thereafter, by the exercise of the highest degree of care, and by the use of appliances and means available to him on said motor bus and with reasonable safety to himself, to defendant's said motor bus, and to all passengers riding thereon, to have, by

the exercise of the highest degree of care, stopped said motor bus, if you so find, and by so doing could have avoided said collision, and that defendant's operator failed to do so and was thereby negligent, if you so find, and that such negligence, if any, caused or directly contributed to cause the said Clarence Akers to be injured and killed, * * *."

It is difficult to conceive that the mere coming of the Akers' car into a position of imminent peril was a *controverted* fact in the case. In both his opening statement and during the trial, counsel for defendant expressly admitted that plaintiff's decedent's death was directly caused and produced by the collision. Insofar as we can see, it is an indisputable fact that his car (and, for that matter, the bus also) came into a position of imminent peril at some point prior to the collision. Neither does the instruction assume that defendant was negligent. It expressly hypothesizes as a prerequisite to a finding in favor of plaintiff the facts which hereinabove we have determined warranted the verdict returned by the jury. The instruction may not be a model but, as to the criticism here made of it, we believe and find that it fairly hypothesizes a finding of facts, supported by competent evidence adduced in plaintiff's behalf, which, when believed by the jury, warranted the verdict so returned. The contention is overruled.

Defendant's final contention is: "Five of the twelve jurors procured seats on the jury by making material misrepresentations as to their qualifications in that they intentionally concealed the fact that they had a claim for personal injuries. The law infers from such deceit that they were biased against the party deceived. Therefore, defendant was deprived of its constitutional right to have its case tried before a panel of twelve impartial jurors. The trial court abused its discretion in failing to declare a mistrial when informed of the concealed claims during the course of the

trial, and again abused its discretion in failing to grant defendant a new trial on appellant's motion therefor after verdict."

If the evidence directly or inferentially shows that the charge above made against said jurors, or either of them, is well founded, it follows that the trial court erred in denying defendant's motion for mistrial, which was duly preserved and amplified in its motion for judgment filed at the close of the evidence and after-trial motion for judgment in accordance with its motions for a directed verdict, or, in the alternative, for a new trial. On the other hand, it is also the law that if, upon due consideration of the charge levelled against either of the jurors, as revealed by the evidence and all other facts and circumstances coming judicially to his attention in this case, and all inferences reasonably to be drawn therefrom, no abuse of discretion on the part of the trial judge in ruling the contention above set forth against defendant is shown, that ruling should not be disturbed. Piehler v. Kansas City Public Service Co., 357 Mo. 866, 211 S.W.2d 459, 462–464; Davis v. Kansas City Public Service Co., Mo., 233 S.W.2d 679, 684–685. In determining the charges here made the trial judge, of course, is not bound by the testimony of these witnesses. It was his duty and prerogative to determine the truth or falsity of them in the first instance. It is our duty on appeal to determine whether he abused the discretion so vested in him. Woodworth v. Kansas City Public Service Co., Mo., 274 S.W.2d 264, 271.

On voir dire examination the jurors were questioned at length by counsel for both parties concerning any claim or lawsuit any of them or any members of their families ever had against any person or corporation for either personal injuries or property damage. Some replied affirmatively and, upon further development of the nature of such claim, its disposition, etc., some were accepted, some were excused, and other veniremen were called to replace those excused. Further details of the questions propounded would unduly lengthen this

opinion. Suffice to say that they were sufficient to require of each of the persons interrogated a full and complete disclosure of any claims or lawsuits in which he or any member of his family was or ever had been involved, to the full extent of his memory and his understanding of the meaning of terms "claims" or "lawsuits" against any person, corporation, be such person or corporation his former employer, stranger, or otherwise. None of the five jurors whose qualifications are herein challenged responded to any of the questions propounded. It is to be assumed therefore that their answers, if made, would have been in the negative.

Trial began on Wednesday morning, January 24th. On the morning of the 26th, in chambers, counsel for defendant announced that an investigation made by St. Louis Index Bureau showed that the five jurors hereinafter named had asserted claims. Following an extended colloquy, the court announced: "In other words, I am not certain that this was done intentionally at this time, and until we go into it more thoroughly, * * *, this is the second time this lady has had to go through this ordeal, I am inclined to go ahead and overrule the motion for a mistrial, but I tell you * * * if it is shown that these jurors intentionally deceived the Court, that the defendant's motion for a new trial, if it is filed, and if they get an adverse verdict will be given a very good deal of consideration."

At the hearing of the motion for new trial, the five jurors testified at length, both on direct and cross-examination. A résumé of the testimony developed from each of them follows:

Juror Koehler: In May, 1956, as he left the home of Mrs. Ringer, he fell down the front steps and sustained a little bruise and broke his glasses. He went back into her home, stayed a few minutes and then went to a doctor; saw him once or twice. He made no claim against her but was paid $25.00 by an insurance company. He re-membered being asked questions as to claims but he honestly did not recall this matter at that time.

Juror Stike: In 1958 he worked for St. Louis Fixture Company. He remembered having been asked on voir dire examination as to claims. About 1958, in pulling a nail, the hammer slipped and hit him on the eyelid and he went to the company doctor three or four times, but he never missed any work. He turned in no claims but was paid workmen's compensation in the sum of $50.00. He just signed his name and received a check. The reason he got the compensation was that he had a little scar. The matter had slipped his mind as he was answering the questions asked him on voir dire—it was so minor.

Juror Pelech: He was born in Yugoslavia, has lived in the United States 12 years. He is now and has been for eight years an employee of Melman Fixture Company. He remembered the questions asked him on voir dire. About eight years ago he was injured at his work. "They" sent him to a doctor, five or six times. He was paid workmen's compensation in the sum of $270. He did not put in a claim, some gentleman came to see him, gave him a ticket and told him he had to go to the Workmen's Compensation Bureau in the Buder Building. In July, 1955, the lady who thereafter became Juror Pelech's wife was involved in an automobile accident in Miami, Florida. His car, in which his fiancee was riding, had a flat tire and a truck ran into the rear of his car. Her neck was injured and she was in shock. The "company" asked her how she felt. "I say 'her back is hurt' and they want to send her to doctor, I said, 'it's not too bad' and I think they gave her fifty or seventy-five dollars, something for that." She did not go to a doctor.

"Q All right. The time, Mr. Pelech, when you were asked, sir, whether you or any member of your family had ever had a claim against anyone, sir, did you say anything about your claim

that you had down at work? A I did not remember, to tell you the truth, if you wouldn't remind me I wouldn't know anything about the claim, because actually, I didn't put any claim in.

"Q All right. Did you say anything about the—your wife being paid that seventy-five dollars down in Florida? A To tell you the truth, I did not pay any attention—not attention, I did not remember anything about that accident, because it was so long ago, and I didn't put any claim in."

Juror Tucker: He has been employed by Curran Construction Company for about a year. Before that he worked for Elliott Construction. Four or five years ago, while at work, a piece of steel weighing about 10 or 12 pounds fell on his foot and fractured his toe. It hurt him about a month but he only lost about a week of work. He went to a chiropractor, the boss' son, and received two treatments, no cast was placed on it. The doctor told him to soak it in water. He was paid compensation for one week. His regular wage was $3.60 an hour. He made a claim for workmen's compensation but had no lawyer and does not remember what he was paid.

"Q Now, will you tell us, * * * when these questions were asked, generally, of the panel, how come you did'nt tell us about it?

* * * * * *

"A In fact, I had forgot about it."

Juror Mueller: In July, 1957, while attending a St. Louis Cardinal baseball game, sitting in the bleachers, she was hit by a "home run ball", didn't see it coming and was dazed. She went to the first-aid room and saw a nurse, and later went to her doctor. She had a knot on her head as big as a baseball for about two weeks and trouble with an eye, but does not remember which eye. That trouble left when the lump on her head went down. She was not confined in a hospital, but had X rays taken. Her doctor told her to send the bills to the Cardinal office and they must have sent them to the insurance company. No one ever came to see her and she had no lawyer. She sent the bills and they came back. Some one at the baseball park told her that she entered the park at her own risk, that they were not liable. She pursued the matter no further. When interrogated on voir dire, she had forgotten all about the matter. Her doctor was concerned about the X rays he had taken. She did not consider it a claim. She thought the questions asked her on voir dire meant "where they had a lawyer and was taken into court." If she had thought the questions referred to a matter such as hers, she would have told about it.

Careful reading of the 43 pages of transcript covered by the testimony of these witnesses, each of whom was questioned out of the presence of the others, reveals nothing that smacks of dissembling on the part of any of them. For aught that appears, insofar as the transcript shows, when the details of the casualty priorly suffered by each of them (or, in one instance, by a lady who later became the wife of one juror) were called to the witness's attention by counsel for defendant, he or she forthrightly and to the best of his or her ability undertook truthfully to answer every question propounded. None of the injuries sustained would appear to be of more than transitory concern to any of these witnesses. But, more important is the fact that the trial judge, who heard and observed them during voir dire examination, throughout trial on the merits, and on motion for new trial and who, as the record shows, gave the matter close and concerned consideration, absolved them from any intent to deceive and saw no evidence of prejudice on the part of either juror against defendant. Finding no abuse of the discretion exercised by the trial judge in so determining the contention here made, we conclude that it cannot be sustained.

The judgment is affirmed.

All concur.