**Barton S. BLOND and Anne Blond, Respondents-Appellants,**

**v.**

**Harry B. OVERESCH et al., Respondents,**

**and**

**Tenth and Main Corporation, Appellant.**

**No. KCD 26982.**

Missouri Court of Appeals, Kansas City District.

Sept. 2, 1975.

Donald L. Mason, Kansas City, for appellant, Tenth & Main Corp.

Warren E. Slagle and Richard F. Adams, Slagle & Bernard, Kansas City, for respondents-appellants.

John E. Redmond, Strubinger & Redmond, Kansas City, for respondent Adelman.

Roy A. Larson, Morris, Mitchell, Larson, King, Stamper & Bold, Kansas City, for respondents Abella and Overesch.

Before SOMERVILLE, P. J., PRITCHARD, C. J., and TURNAGE, J.

TURNAGE, Judge.

This appeal follows a jury verdict in favor of plaintiff Barton Blond (Blond) for $75,000 for personal injuries and for his wife Anne Blond for $15,000 for her loss of her husband's services and consortium. A judgment was entered on such verdict against Tenth and Main Corporation (Ten Main), and it appeals.

As a result of the decision of this court in *State ex rel. Blond v. Stubbs,* 485 S.W.2d 152 (Mo.App.1972), plaintiffs joined, in their suit against Ten Main, three physicians who allegedly treated Blond negligently for his injuries. The jury verdict and judgment were in favor of the physicians and Blond has appealed from that judgment.

On March 31, 1969, Blond was an associate in the law firm of Lathrop, Righter, Gordon and Parker, with offices in the Ten Main Center Building located in downtown Kansas City. On that same day, according to plaintiff's evidence, he was leaving the Ten Main Center Building to go to the Jackson County Courthouse. He stated the Ten Main Building had double action doors leading from the lobby to Main Street. These doors would swing either out or in according to the way they were pushed by the person using them. There were two sets of doors, one set being located at the lobby and the outer set being located at Main Street with a six-foot vestibule separating the two sets of doors. Each set consisted of two doors, with one hinged on the north side of the doorway and one hinged on the south side.

Blond testified as he started to leave the lobby the inner set of doors were propped open. He stated he was not in any particular hurry and walked normally toward the outer set of doors carrying his brief case. He stated as he drew near the door on his right and was about to exit onto Main Street, the door suddenly swung inward. He said the door struck him on the left knee and caused him to go completely through the glass and to fall on the Main Street side of the door. The evidence showed the door had polished plate glass which shattered on impact. After falling on the outside of the door, Blond had several cuts about his face and hands, but the more serious was a deep laceration on the calf of his left leg. Blond stated he could see the bone and knew the cut was obviously deep. Blond was bleeding profusely and in a very few minutes a policeman from the Kansas City Police Department arrived and applied a tourniquet. An ambulance was called and Blond was taken to the emergency room at Menorah Hospital. After having his wounds sutured at the hospital, Blond was taken home. The injuries and disabilities suffered by Blond and his subsequent medical treatment will be detailed later in connection with Ten Main's contention that a remittitur should be ordered.

Plaintiffs' evidence with reference to the operation of the doors where Blond was injured showed the doors were equipped with closers which were supposed to return the doors to a closed position after they were pushed either toward the outside or toward the inside and to maintain them in a closed position until the next person would push the door. Plaintiffs' evidence was that such doors did not stay in a closed position but would frequently stand partially open anywhere from a few inches to almost a foot. Two employees of Ten Main, one of whom was the Ten Main Center Building manager, stated they knew the doors stood in this open position. They stated the reason was an imbalance between the air pressure on the inside and the outside of the building. A consulting engineer called by Blond stated the closers were not working properly because they did not hold the doors in a closed position. He stated the doors should act in a sure and deliberate manner to return the door to a closed position after it was open and to maintain it at that position. He stated neither air pressure from the inside nor wind from the outside, short of near tornado velocity, should cause the door to open inward without someone pushing. He stat-

ed the door closers were malfunctioning by reason of the doors standing open.

One of Ten Main's employees conceded the door closers were not operating properly. He agreed the purpose of the closers was to bring the doors back to a closed position after a person passed through and to maintain them in that position until their next use. He stated no effort had been made to correct the situation to make the door closers work properly. The building superintendent stated there was no adjustment that could be made on the door closers to make them stay in the closed position except when in actual use. The inference was the closers would have to be replaced to have a proper operation of the doors. He stated the closers were the ones originally installed when the building was built in 1968.

Blond testified he had seen the doors on previous occasions blow both toward the outside and inside. He also stated he had seen the doors swing two or three times after someone would pass through. Dan Dibble, another attorney in the Lathrop office, also stated he had seen the doors blow back and forth, sometimes toward the inside and sometimes toward the outside.

The law firm had moved into this building in September, 1968, and in January, 1969, William Stapleton, another attorney in this office, had written to the president of Ten Main complaining about the doors on the Tenth Street side blowing open and on one occasion coming open at a time when it very nearly struck Stapleton.

Ten Main introduced evidence from a number of witnesses to show that at the time of his injuries, Blond was walking toward the doors in question with his head turned to one side so that he was not looking at the doors. These witnesses testified the doors at the time Blond approached were in their normal closed position and that without looking, Blond simply walked through the door and fell to the outside.

The court gave two verdict directing instructions against Ten Main which submitted Blond's theory of the accident. These instructions were identical except for the fact one was with reference to Mr. Blond and one was in reference to Mrs. Blond. Such instructions were MAI 22.05. The only deviation was the insertion in the first paragraph of the condition, as described by Blond, as to what caused his injuries. Ten Main submitted appropriate instructions tendering the issue of Blond's contributory negligence.

Ten Main first contends the verdict directing instructions given by Blond and his wife were erroneous. The instruction given on behalf of Blond is as follows:

"Instruction No. 3

"Your verdict must be for plaintiff Barton Blond and against defendant Tenth and Main Corporation if you believe:

"First, there was a condition existing in the door closers that allowed said doors to swing improperly or failed to maintain tempered or safety glass in the doorway, and as a result said doorway was not reasonably safe; and

"Second, defendant knew, or by using reasonable care should have known, of this condition; and

"Third, defendant failed to use ordinary care to make the doorway reasonably safe; and

"Fourth, as a direct result of such failure plaintiff was injured;

"Unless you believe plaintiff is not entitled to recover by reason of Instruction No. 5.

"The term 'ordinary care' as used in these instructions means that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances."

Instruction Number 4 was identical except for using the name of Anne Blond.

Ten Main's attack on these instructions distills into the fact the instructions do not require the jury to find the door suddenly swung inward. Ten Main says this was plaintiffs' theory and this was the ultimate fact which was to be submitted to the jury. Ten Main further argues the instruction does not confine the improper swinging of the doors to a sudden inward swing, and would, therefore, allow the jury to consider the evidence of outward swinging of the doors in order to find liability, contrary to plaintiffs' own theory.

The answer to Ten Main's argument lies in the definition of the ultimate facts involved in this case, contrasted with the evidentiary details which are to be excluded from the instructions. Rule 70.01 requires only ultimate facts be submitted in instructions. Here MAI 22.05 was used but such instruction in the first paragraph contains the direction to "here describe condition which caused the injury, such as 'a hole in the stairway' ". Thus the instruction should contain a description of the condition which caused the injury and not evidentiary details concerning the condition or the occurrences.

It is apparent the condition which caused the injuries was the malfunction of the door closers. This would be true whether the injury occurred when the doors swung out or in, since it was this condition in the construction of the doors which allowed the doors to swing when they were not actually in use. A description of the door swinging in or out would be a detail which would merely comment on the underlying condition which gave rise to the swinging of the door. The purpose of MAI is to submit only ultimate facts and to strip away the evidentiary details therefrom. *Zipp v. Gasen's Drug Stores, Inc.*, 449 S.W.2d 612, 617[3-4] (Mo.1970).

Furthermore the instruction should hypothesize only the essential *disputed* facts. This was stated in *Epps v. Ragsdale*, 429 S.W.2d 798, 802 (Mo.App.1968) as follows: "[u]nder MAI the acid test of an instruction is whether it follows the substantive law in hypothesizing the ultimate disputed facts, cut to the bare essentials; it should be all muscle and no fat". In this case there was no dispute that if Blond's evidence was to be believed, the door swung inward. There was no evidence concerning any outward movement of the door at that time and no evidence whatever that any outward movement of the door in any way caused any injury. The sharply disputed fact was whether or not Blond simply walked into the door while oblivious to the existence of the door or whether the improper operation of the door caused the accident. In this situation the direction of the movement of the door was simply an evidentiary detail which is not to be submitted in MAI. The ultimate fact which the jury had to decide was whether or not there was a condition in the doors which allowed them to swing improperly and whether or not this caused Blond's injury, or whether Blond did in fact fail to take heed of the existence of the door and walk through it. By submitting the ultimate fact of the condition of the door which allowed it to swing improperly, the instructions in this case properly submitted only the ultimate fact.

A somewhat similar situation was involved in *Zipp* in which an instruction which submitted the issue of an employee pushing the safe without warning was held to be the ultimate issue, and the distance and direction the safe traveled were properly omitted as being evidentiary details. In *Bonenberger v. Sears Roebuck and Company*, 449 S.W.2d 385 (Mo.App.1969) the court approved an instruction which submitted that a sledge hammer had been swung in a negligent manner. The court there observed the ultimate fact was the swinging of the sledge hammer in such a manner as to cause injury and the instruction, together with the definition of the term negligence, submitted the ultimate facts.

By submitting the ultimate fact of the condition of the door which allowed it to swing improperly the instruction in this case properly submitted the ultimate fact.

By doing so, it did not give the jury a roving commission to find for the plaintiffs on any theory which the jury might want to find. See *Williams v. Ford Motor Company,* 411 S.W.2d 443 (Mo.App.1966).

Ten Main next complains of the same instructions on the grounds there was no evidence Ten Main had actual or constructive knowledge the doors which Blond was using had suddenly swung inward and for that reason such instructions were given without evidentiary support. On this point, Ten Main overlooks the evidence heretofore detailed concerning the testimony of both Blond and Dan Dibble that they had seen the doors swing both inward and outward. Furthermore, Ten Main's own employees, Pritchard and Tipton, stated they knew the door closers were not operating properly on the Main Street doors. This knowledge on the part of Ten Main's employees constitutes actual knowledge and is sufficient to show knowledge on the part of Ten Main that the doors were operating improperly. *Maybee v. Missouri Orpheum Corporation,* 238 Mo.App. 537, 181 S.W.2d 771 (1944).

There was ample evidentiary support for the giving of these instructions. Ten Main makes some mention in its brief about the lack of evidence concerning when the doors were observed to blow inward, but this argument has not been preserved in the "points relied on" in Ten Main's brief and for that reason cannot be considered. *Brokaw v. Brokaw,* 492 S.W.2d 859 (Mo.App. 1973). However, with actual knowledge of the malfunction of the door closers, there was evidence from which the jury could find Ten Main failed to exercise ordinary care in the maintenance and operation of the doors. This would be sufficient to establish liability. The instructions are not infirm by reason of being without evidentiary support, but were in fact supported by substantial evidence.

Ten Main next contends it is entitled to a new trial because juror Pollock intentionally and willfully concealed a prior claim for personal injury in failing to disclose such claim in response to questions propounded during the voir dire examination. In response to questions concerning any claims made for personal injuries, some members of the jury panel answered in the affirmative, but juror Pollock, who later was foreman of the jury, remained silent.

After the trial of this cause, Ten Main discovered juror Pollock had been paid $100 by Allstate Insurance Company for personal injuries resulting from an accident on April 10, 1972. A hearing was held on this matter by the court in connection with the consideration of Ten Main's motion for a new trial.

At this hearing it was developed that juror Pollock's automobile was struck from the rear and in a recorded telephone conversation with an Allstate employee on the day of that accident, Pollock was asked if he had been injured. In response he stated: "no more than a stiff neck and just jolted around. My neck is a little stiff on me though". Pollock further stated he was going to Richards Gebaur Air Force Base for a physical examination to determine if he had been injured. He was entitled to use the Air Base facilities because he was a retired Air Force officer.

In his testimony before the court, Mr. Pollock stated the physical examination revealed he had not been injured. He stated he negotiated a settlement with Allstate which resulted in a payment to him of $500. He stated this payment was for property damage to his automobile and for his inconvenience as a result of the accident. He further stated he did not remember this claim at the time of the voir dire examination because he did not consider he had a claim for personal injury but considered he had made a claim for property damage only. Ten Main produced the adjuster for Allstate who negotiated the settlement with Mr. Pollock. The adjuster stated he coded $100 of the $500 paid to Mr. Pollock as being for personal injuries based on the fact Mr. Pollock had ten x-rays taken in his physical examination. The adjuster re-

ceived no report from any physician concerning any injury to Mr. Pollock and stated the basis of the personal injury payment which he stated had been made was the ten x-rays. He further stated the $500 Mr. Pollock received was calculated on the basis of $377.50 for car damage, $22.50 for loss of use of the automobile and $100 for personal injury. The same trial judge who presided at the trial overruled the motion for a new trial and thus found juror Pollock had not intentionally and willfully concealed the personal injury claim.

The rules concerning the concealment of a matter by a prospective juror are well settled and are fully enumerated in *Beggs v. Universal C.I.T. Credit Corporation,* 387 S.W.2d 499 (Mo. banc 1965). The court stated at 387 S.W.2d 503[2–8]: "[i]n the final analysis, therefore, the question of what result should follow the failure of a juror to correctly answer a question touching his qualifications depends upon whether or not he was guilty of an intentional concealment. Primarily, the determination of that question must be left to the sound discretion of the trial court."

The question to be determined here is whether or not the trial court abused its discretion in finding that juror Pollock did not intentionally and willfully conceal a material fact. Ten Main argues an abuse is shown because a few days after the trial Mr. Pollock had no difficulty in recalling his accident, and also recalled an accident in which his wife was involved. He stated his wife received no personal injuries and Ten Main makes no point of this except to argue it shows the exercise of a selective memory on the part of Mr. Pollock. Ten Main also argues that since Mr. Pollock recalled his accident a few days after trial, it could well be inferred he could recall the accident at the time of the voir dire but chose not to reveal such accident. Rather, the argument goes, he elected to judge his own qualifications by remembering the accident but thinking it had no connection with the inquiry being made. It is beyond question that if juror Pollock intentionally concealed his accident while remembering the existence of the same by electing to judge his own qualifications, then he would be disqualified and the trial court should have granted Ten Main a new trial. *Beggs, supra.*

However, the trial court obviously believed Mr. Pollock did not remember his accident at the time of the voir dire examination because of Mr. Pollock's belief such accident had involved only property damage and did not involve any personal injury. This view is sustained by the record. Here Mr. Pollock stated only that his neck was stiff on the day of the accident but further stated a complete physical examination, which extended over a day and a half, within two days after the accident, revealed he in fact had suffered no personal injury. This, coupled with the fact there was no report ever made to the insurance company of the examination by a physician would indicate no actual injury. The statement by the adjuster that his payment for personal injury was based solely on the grounds Mr. Pollock had been x-rayed ten times in connection with his physical examination and not for any actual injury confirms the absence of injury. All of this would be consistent with an opinion by juror Pollock that he in fact did not receive any personal injury and, therefore, had no personal injury claim to report in response to the voir dire examination.

The situation here is very similar to that in *Akers v. St. Louis Public Service Company,* 370 S.W.2d 347 (Mo.1963). There the court stated at page 355: "[n]one of the injuries sustained would appear to be of more than transitory concern to any of these witnesses. But, more important is the fact that the trial judge, who heard and observed them during voir dire examination, throughout trial on the merits, and on motion for new trial and who, as the record shows, gave the matter close and concerned consideration, absolved them from any intent to deceive and saw no evidence of prejudice on the part of either juror against

defendant. Finding no abuse of the discretion exercised by the trial judge in so determining the contention here made, we conclude that it cannot be sustained."

The same result must be reached here as in *Akers.* No abuse of discretion on the part of the trial court is shown.

Ten Main next contends the verdict is the result of bias and prejudice because of the misconduct of juror Pollock as discussed above in concealing a prior claim. The finding by this court that the trial court did not abuse its discretion in rejecting Ten Main's contention that juror Pollock was guilty of an intentional and willful concealment, disposes of this contention by Ten Main. It is settled that a jury verdict may not be set aside because of bias and prejudice on the part of the jury unless there is some error committed at the trial. *Hager v. McGlynn,* 518 S.W.2d 173 (Mo. App.1974). Since no other error has been found, there is no basis upon which to set aside the verdict on the basis of bias and prejudice.

Ten Main finally contends the judgment is so excessive as to require a remittitur. This requires an examination of Blond's injuries and the evidence concerning his future.

At Menorah Hospital Blond was found to have a large cut on the inside of his leg from four to five inches long which exposed the bone. He had cuts just below the kneecap on the left, with cuts on his forehead, face and hands. These cuts were sutured and bandaged and Blond was told to go home and was further told he should be able to return to work the next day. However, on trying to get up from the examining table, Blond discovered he was unable to lift his left leg and was unable to stand. He was assisted to the car and from the car to his bed at home. Three days later Blond was still in bed and could not lift or move his leg. He noticed the kneecap was about two inches higher on the left than on the right. His physician at that time advised him to try to walk and to go back to work. Blond tried this with the aid of crutches but he was still unable to stand on his left leg. In time Blond was able to put some weight on his leg and could walk with crutches, and later a cane. Blond returned to work and walked with the aid of a cane. He was moving about very slowly and while returning from lunch one day fell because his left leg collapsed.

Blond then sought other medical advice and was seen at Research Hospital where he had blood aspirated from his left leg and his leg was placed in a cast for ten days. On removal of the cast, the entire muscle on the left was smaller than the right and the kneecap was still about two inches higher than normal. Although he was going to physiotherapy, he still had to drag his leg to walk and stated he could not move his leg properly because it did not feel like it was connected under the knee.

Blond then sought other medical advice and had physiotherapy prescribed in an effort to strengthen the leg. Finally this physician operated on the knee. Although the physician assured Blond prior to the operation that everything would be fine, afterwards when the physician talked with Blond's wife he was very pessimistic and stated he thought Blond would be able to walk again but it would be sometime. The physician found during the operation, the patellar tendon had been severed and because of a large amount of scar tissue he was unable to find enough of the remaining ends of the tendon to satisfactorily reunite it. The physician stated Blond would have to be extremely careful with his leg because he was afraid the repair work which had been done would be damaged on removal of the cast. Following this operation the thigh of the left leg was again noticed to be smaller and the kneecap was still higher than normal. Blond was unable to walk for some period following this operation and had to undergo physiotherapy for several months after the cast was removed. He did various exercises in an effort to strengthen his leg and after a considerable length of

time was able to walk with crutches, then by using a cane, and finally without any aid.

Blond continued to have difficulty with his leg in limping and being able to walk on anything except a perfectly flat surface.

After the above operation and treatment by three physicians, Blond was still not satisfied with his progress so he consulted an orthopedic surgeon in New York City. This surgeon referred him to Dr. Peltier at the University of Kansas Medical Center. Dr. Peltier, on examination, was of the opinion that Blond had an old rupture of the patellar ligament and recommended surgery. Dr. Peltier operated on Blond's left knee and found only a small tuft of tendon anchored to the leg below the knee. There was not enough tendon which could be used to attach the kneecap to the bone below and above the kneecap. Dr. Peltier then cut the upper end of the gracilis tendon from the inside of the left thigh and pulled it down and drilled a hole through the patella, or kneecap, and ran the tendon through such hole. He also drilled a hole in the tibial tuberosity and anchored the tendon to the bone below the knee. This was to substitute for the tendon severed in the accident which was no longer of any use.

After being in a cast about six weeks, Blond was followed in the out patient clinic of the hospital.

At trial Blond testified he could walk on even surfaces but could not walk on any rough or uneven surface. He stated he had to go up and down stairs by "hiking or lurching" his body in order to move his left leg. He stated he had pain in his leg and knee constantly, with increased pain when the knee was bent. He stated he could not squat or stoop but could only bend from the waist. He stated he had been very athletic in college and prior to the accident playing tennis, squash and handball, but after the accident was confined to swimming and riding a bicycle. He stated he could not help his wife around the house, nor could he do the yard work he had previously done, nor could he play with his two children except to the extent of sitting down and playing stationary games. Although his children were young and would have been easy to carry normally, Blond stated he was unable to carry his children or lift them.

At the trial, about four years after the accident, Blond stated he still had pain constantly in his left leg and knee. He stated in an effort to reduce the pain he always tried to keep his leg straight. While this did not completely relieve the pain it would help reduce it. He stated he still had the same difficulty in walking on anything except an even surface and had particular difficulty with inclines, steps and ladders.

At trial Dr. Peltier stated Blond had normal extension in terms of range and motion of the left leg, but lacked fifteen degrees of full flexion. He stated the kneecap was still high and the circumference of the thigh muscle was an inch to an inch-and-a-quarter smaller than the right side which was the result of muscle atrophy. The doctor stated Blond was impaired in walking and using steps and in walking on rough surfaces. The doctor also stated Blond had chondromalacia, which is a softening of the cartilage on the underside of the kneecap. Dr. Peltier stated he had advised Blond against any sports that involved running, or any activity that would be any strain on his left leg. Dr. Peltier described all of the conditions which he observed in Blond to be permanent.

Anne Blond testified to the same difficulties which Blond had described with his mobility and the weakness of his left leg. She also stated Blond had done the usual housework, including building and general household repairs, prior to the accident, but after the accident had been unable to do any of these.

Ten Main admits in its brief that Blond's life style has been changed as a result of this accident. Ten Main also does not question the nature and extent of Blond's injury as described by him and his physician. It

argues that even with this admitted, the verdict is excessive.

Blond had medical expenses of $4,640.89 and was obligated to repay his law firm $3,075 for salary paid but unearned because of work missed by reason of his injury.

At the time of his accident Blond was 30 years old with a life expectancy of 37.70 years.

There is no dispute concerning the rules to be applied in determining when a verdict is excessive. "On appeal, we can act only when excessiveness appears as a matter of law. Normally the jury is the final arbiter and we can order remittitur only when the verdict is clearly for an amount in excess of the very most that the proof of damages could reasonably sustain, and then only when the judgment is so excessive as to shock the conscience of the court." *Allen v. Bi-State Development Agency,* 452 S.W.2d 288[9–10] (Mo.App.1970).

Ten Main places its argument more on the side of uniformity than it does on pure excessiveness. It relies mainly on *Crane v. Northrup,* 413 S.W.2d 190 (Mo.1967). In *Crane* a carpenter suffered multiple fractures of one leg and a fracture of the other with "malalignment of the toes and the ball of the foot".

The St. Louis District of this Court in *Sanders v. H & S Motor Freight, Inc.,* 526 S.W.2d 332 (Mo.App.1975) fully considered *Crane* in passing on a request for remittitur. The court in *Sanders* pointed out the court in *Crane* stated the plaintiff in *Crane* had movement of his knee and his leg was a good usable leg. The court also stated in *Sanders* one of the considerations which defies any precise measurement is the existence of pain. In the case at bar, Blond testified he had constant pain in his leg and knee some four years after the accident. Because of the dissimilar injuries, and the erosion of the purchasing power of the dollar since 1967, *Crane* is not controlling.

The controlling factors in considering excessiveness and whether or not a remittitur should be made are set forth in *Woodford v. Illinois Central Gulf Railroad Co.,* 518 S.W.2d 712, 718[13–17] (Mo.App.1974) as follows:

> "The factors bearing on whether a verdict is excessive are well known. They are: (1) the nature and extent of plaintiff's injuries, (2) the permanency of plaintiff's injuries, (3) plaintiff's age, (4) examination of cases involving awards for similar injuries, (5) due regard for economic factors (inflation, etc.), and (6) an awareness of the fact that the jury and the trial court had a superior opportunity to appraise plaintiff's injuries . . . It is axiomatic that in reviewing the excessiveness of a verdict, only the evidence favorable to the plaintiff will be considered."

It would only serve to prolong this opinion to discuss and distinguish other cases cited by Ten Main which admittedly do not involve the same type of injuries as does this case, nor would it serve any useful purpose to further discuss the familiar rules governing this situation. In the end this court has to determine whether or not the award of $75,000 to Blond and the award of $15,000 to Anne Blond is so excessive as to shock the conscience of this court. While these awards might be considered to be on the higher side of what the evidence in this case would justify, after a careful consideration of the record, this court is unwilling to say such awards are so excessive as to require a remittitur. The experienced trial judge who presided over this trial was requested to make a remittitur and declined to do so. The law rightly vests a broad discretion in the jury in fixing the amount of an award. On appeal this court is required to view the evidence in the light most favorable to the plaintiff. In this case it cannot be said the trial court abused its discretion in failing to order a remittitur and this court likewise refuses to do so. *Grossman Wrecking Company v. Bituminous Casualty Corporation,* 518 S.W.2d 719 (Mo.App.1975).

The judgments in favor of Blond and his wife against Ten Main are affirmed.

In oral argument counsel for Blond and his wife stated if the judgments in their favor against Ten Main were affirmed, the appeal filed by the Blonds against the three physicians could be dismissed. On this stipulation, the appeal by plaintiffs against Drs. Overesch, Abella and Adelman is hereby dismissed.

All concur.