Joy BOYDSTON, Respondent,

v.

William L. BURTON and Dale Boydston,
Appellants.

No. 48917.

Supreme Court of Missouri,
Division No. 2.

May 15, 1964.

Motion for Rehearing or for Transfer
to Court En Banc Denied
June 8, 1964.

Thomas A Sweeny, Kansas City, for appellant Dale Boydston, Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

Thomas E. Deacy, Edward W. Mullen, Deacy & Deacy, Kansas City, for appellant Burton.

Hale Houts, J. D. James, Thad C. McCanse, Houts, James, Randall, Hogsett & McCanse, Kansas City, for respondent.

LEEDY, Judge.

Action by Joy Boydston for damages for personal injuries; trial to a jury resulted in a verdict and judgment for the plaintiff and against defendants William L. Burton and Dale Boydston in the sum of $60,000, from which judgment the named defendants prosecute separate appeals.

Plaintiff was a passenger in the front seat of a Chevrolet owned and being driven by her 19-year-old brother-in-law, defend-ant Dale Boydston. This car was involved in a head-on collision with a Volkswagen being driven by defendant Burton. The driver of a third vehicle (Lester E. Tinsley) was joined as a party defendant, but at the close of plaintiff's evidence the court sustained his motion for a directed verdict. That action is not challenged, so Tinsley's role as a defendant has passed out of the case.

The collision occurred about 11:30 a. m., on Sunday, March 22, 1959, on a graveled county road in Platte County known as the Hampton road. The weather was clear and the road dry. At the place in question the road runs in a generally east-west direction. It was described in the evidence as being hilly and "curvy," conditions verified by the photographic exhibits. The Chevrolet in which plaintiff was riding was eastbound, and the Volkswagen driven by Burton was traveling west. The Tinsley car (a Chevrolet) was following the Burton Volkswagen at a distance of about three car lengths. The collision occurred at or near the crest of a hill, and the point of impact on each car was from about the center to the left side of the front.

Plaintiff's case was submitted as against the defendants severally by separate verdict-directing instructions (Nos. 2 and 3) which instructions hypothesized negligence on the part of each defendant in failing to keep a reasonably careful and vigilant lookout for approaching vehicles, and, disjunctively, failure to drive upon the right half of the roadway. As a part of the submission of the first of the foregoing negligent omissions (failure to keep a lookout), instruction No. 3 (having to do with Boydston alone) included the further hypothesis, in the conjunctive, "that in the exercise of the highest degree of care he could and should have seen, the Volkswagen approaching in time to have swerved to the right side of the travelled portion of the road and avoided the collision * * *." By instruction No. 4 the jury was instructed as to the situation in which it would be its duty to return a verdict against both defendants

(in substance, that if the jury found "that the negligence, if any, of defendant Dale Boydston and the negligence, if any, of defendant William Burton, directly concurred, combined and contributed to cause" plaintiff's injuries, etc.).

The points relied on by Burton are: (1) That the evidence showed plaintiff was guilty of contributory negligence as a matter of law; (2) that certain photographs were improperly received in evidence; (3) error in the giving of plaintiff's instruction No. 4; and (4) that the verdict is grossly excessive in amount.

Boydston's assignments are: (1) That the evidence was insufficient to submit either the hypothesis that he was driving his car on the wrong side of the road, or that he failed to keep a lookout; and (2) the excessiveness of the verdict.

Gerald Winters, a highway patrolman, reached the scene within thirty minutes after the collision occurred, and before the ambulance arrived. He found the Boydston and Burton vehicles "were not right up against each other, but they were very close." There was debris (broken pieces of glass, metal, oil and water) in the road under the vehicles (this point being about 20 or 30 feet east of the crest of the hill). In general, this debris was on the south half of the road (i. e., Boydston's side), including, specifically, that under the Volkswagen. At this point the traveled portion of the road (that having gravel on it) was found to measure 24 feet in width. There were narrow shoulders (about 2 feet wide) and a grader ditch on each side. There was no marked center line of the road, and nothing to mark the edges, but "like most gravel roads, the edges kind of wavered back and forth a little bit," so that if measured at one particular place it might be a foot or so wider than at another particular spot. Estimates of their respective speeds as given to the patrolman were: Boydston, 35 m. p. h.; Burton, 35 to 40 m. p. h. Boydston stated to the patrolman (and it was admitted against him alone): "We came up

over the hill and it looked like he was over on my side, and I put on my brakes and then we hit." Burton's statement made at the scene (and its admission similarly limited) was: "I was driving west and this car was driving east, and maybe we were both driving in the middle of the road, I don't know, it all happened so fast, I never did see the car behind me."

The highway patrolman described the crest as being "rather gradual * * * with the road coming up from both sides at an angle to the crest." He, nevertheless, estimated the grade of the road to be 10% on the west side of the crest (from which side the Boydston Chevrolet approached), and 15 to 20% on the east side of said crest (from which latter direction the Burton Volkswagen approached), but he made no measurements as to visibility of travelers in the vicinity of the crest.

Boydston's car laid down skid marks 61 feet long, and the Burton car laid down skid marks 41 feet long, measured from the point of collision west and east, respectively, thus indicating the cars were about 100 feet apart when they started to skid. Boydston's left (or north) tire mark was 11 feet, 8 inches north of the south edge of the traveled portion of the road. Burton's left (or south) tire mark was 10 feet north of the south edge of the traveled portion of the road.

Plaintiff testified that "maybe half a block" before they reached the crest of the hill," and while driving at 30 to 40 miles per hour, her brother-in-law pointed out a house on the south side and adjacent to the road in which his parents had formerly lived, "and I had turned to look at the house, kind of like that [indicating] and then I turned back and we were coming over the hill then and the Volkswagen was there;" that as they came over the crest and ran into the Volkswagen there was at least "a car's width" of space between the right side of the Boydston car and the south edge of the road, but her brother-in-law did not swerve. (Plaintiff thought she

heard him say later that he "just hit the brakes and kind of froze.")

Boydston's attack upon the submissibility of the hypothesis that he failed to drive upon the right half of the road is based on the theory and assumption that plaintiff, "by her judicial statements," placed him (Boydston) on the right side of the road, thus precluding her use of, or reliance upon the testimony of her witness Mrs. Tinsley "that Boydston was partially on each side of the road, not entirely on his wrong side of the center, and not entirely on his right side of the center." Conversely, Burton's contention that plaintiff was guilty of contributory negligence as a matter of law is based on (1) plaintiff's own testimony to the effect (so he asserts) that Boydston was driving on the wrong side of the road not only when approaching the hillcrest in question, but also other hillcrests while traversing the mile and a half or two miles that they had been on the Hampton road, and (2) plaintiff's admitted failure to make complaint or protest to Boydston so as to influence the situation for safety. While these two points are mutually exclusive, both are determinable upon a consideration of plaintiff's own testimony. The further portions of her testimony relevant to both questions follow; first, that in reference to the position of Boydston's car at the time she saw the Volkswagen and the collision:

"A. His left wheel, his driver's side wheel was in the center track and his right wheel then was on south, he was in the center track on—

"Q. There was no—or was there a line—

"A. No.

"Q. —black line marked down the center of the highway?

"A. No. When I am speaking of the center, I mean the center track.

"Q. Well, what part of the center track were the left wheels in?

"A. Right in—

"Q. What I am trying to find out is whether they were right in the center of the road [or?] on one side or the other of the center of the road.

"A. They were right in the center of the center track.

"Q. And then extended a car's width, I take it, to the right of that?

"A. Yes."

When she saw the Volkswagen and at the time of impact it was partially, but not completely over the "center track—maybe half a car, one or two feet * * * he was over it a little."

On cross-examination by counsel for Burton, plaintiff stated that during the mile and a half or two miles that they had been on the Hampton road, her brother-in-law had been driving at the same speed, approximately 30 to 40 miles per hour; that during that entire time "he had been driving with the left side of his *car* right at the center of the *road* * * * as far as I know," and that she believed this continued "right up to and including the time of this accident;" that she believed "he had gone up all these other hills and down hills, and so forth, in the same manner that he approached this hill," and that she made no protest or complaint to him about driving in that manner. She also agreed that "if his left *wheels* were on the center line of the *road,* then the left side of his car, the fenders and the bumpers and so forth would extend out some four, six or eight inches, whatever the distance is, beyond that, beyond the wheels."

Cross-examination by Boydston's counsel developed the following:

"Q. Isn't it true, Mrs. Boydston, that this collision was on Dale's side of the road?

"A. It was from the center over to the south side, yes.

"Q. Was it on Dale's side of the road? A. Yes. * * *

"Q. And isn't it true, and don't you know that your car was on your own side of the road?

"A. It was on the south half of the road, yes.

"Q. And I am talking about now the entire car, Joy.

"A. No. *The left wheels were in the center track so that wouldn't make it completely on the—*

"Mr. James: Pardon me just a minute. I object to counsel interrupting the witness.

"Q. (By Mr. Sweeny) Go ahead. A. *So that wouldn't make it all on the right side of the road,* but it was from, it started from the center of the left—or the right.

"Q. From the center? A. Center to the south.

"Q. To the south? A. Yes.

"Q. All right. Joy, would you say any part of Dale's car was over the center? A. Not to my knowledge, no.

"Q. And therefore the wheels were not directly at the hairline center point? Isn't that true? [Objected to; overruled.]

"The Witness: What do you mean?

"Q. I say, of course, there was no center line? A. No.

"Q. And the exact center would be about the width of a hair, you know, to really figure out where it would be, but aren't you satisfied and aren't you telling the jury, Joy, that Dale's entire car was on the south side of the road at all times before this accident? [Objected to; overruled.]

"Q. (By Mr. Sweeny) The Judge says you should answer, Joy.

"A. Yes, it was on the south side of the road.

"Q. The entire car? A. Yes

"Q. And that is at all times before this accident? A. Yes.

"Q. And up to the time of the accident? A. Yes.

"Q. And that is Dale's own side of the road? A. Yes."

The following occurred on re-direct examination:

"Q. Now, Mr. Sweeny asked you about the position of Dale's car in the road, and I believe you testified that the left *side* was in the center of this center *path.* A. Yes.

"Q. Where would that put it with reference to the traveled portion of the road as a whole? Was it directly in the *center of the road?* A. Yes. * * *

"Q. Was a portion of Dale's car in the center of the road or not at the time of the impact? A. The left wheels."

■ We fail to find anything in the photographs identifiable as a "center track," so neither its location or the precise meaning of that term appears. The words "lane" and "path" were also used with reference to surface patterns in or upon the gravel, again without anything substantially identifying their nature, number or location. We hold the statements of plaintiff to the effect that *Boydston's* car was on its own side of the road are not conclusively binding, and to the exclusion of other portions of her testimony and that of other witnesses from which the contrary would appear and support her theory of liability against each of said defendants. What was said by her in both connections obviously constituted estimates as to the position of the car. "[A] party is not conclusively bound by his mere estimate of time, speed or distance, or the position of an automobile or train at the time of an accident. His testimony in regard to such matters does not preclude him from relying upon the more favorable testimony of other witnesses in the case, unless the testimony of the other witnesses is inconsistent with his theory of the case or contrary to physical facts." Smith v. Siercks, Mo., 277 S.W.2d 521, 525. Plaintiff's theory throughout was that both de-

fendants were negligent in the same respects, so there was no impingement upon the foregoing principle, insofar as inconsistency with her theory of the case is concerned. And as it is not contended that such other testimony was contrary to physical facts, it was for the jury to resolve the contradictions and inconsistencies in plaintiff's own testimony in determining its weight and value. This it did in her favor, as indicated by the verdict. Besides the testimony of Mrs. Tinsley that Boydston was partially on each side of the road, Boydston himself admitted as much. Consequently, it was not error for the court to submit the hypothesis of Boydston's negligent failure to drive on the right half of the road.

■ The ruling just made disposes of Burton's contention that plaintiff was guilty of contributory negligence as a matter of law. That contention is based on that portion of plaintiff's cross-examination by Burton's counsel hereinabove set forth concerning the location of the Boydston car at and as it approached the point of collision. As we have seen, the whole of her testimony on that subject, even though contradictory and indefinite, amounted to estimates so that she was not bound by any one portion to the exclusion of the other. Under her testimony and estimates the jury could have legitimately found that Boydston's car was partially over the center of the road only at the time plaintiff saw the Volkswagen and the collision. Consequently, the court did not err in submitting the question of plaintiff's contributory negligence to the jury rather than declaring it as a matter of law.

■ Boydston also contends there was no evidence to justify the submission of failure on his part to keep a lookout. Without repeating, but bearing in mind that the evidence shows Boydston was admittedly driving at or near the center of the road as he approached and passed over the view-obstructing crest, it also appears from a further admission on his part that it would have been possible for him to have first seen the top of the Volkswagen emerging on the other side of the hill at a distance of 170 to 180 feet, but that he did not actually see it until he was only 100 to 150 feet from it. Accordingly, under the view of the evidence most favorable to plaintiff, it appears that after Boydston could have first seen the top of the approaching Volkswagen, he traversed a distance of as much as 80 feet without actually seeing it, although visible. From all the facts and circumstances surrounding the collision a jury could reasonably draw the inference that Boydston failed to keep a lookout, and hence the evidence warranted the submission of that issue.

Having held, contrary to Boydston's contention, that plaintiff was not judicially committed to the theory that he (Boydston) was traveling on the right side of the road, we need not notice his attack on that portion of plaintiff's verdict-directing instruction (No. 3) which is allegedly contradictory of such theory (now rejected) and therefore confusing to the jury.

■ Burton complains of the action of the court in admitting four photographs offered by Boydston. These were taken shortly before trial, and nearly two years after the accident. They were identified as showing the state of visibility or sight distances existing at the location in question, and open to the drivers as the Volkswagen came up to the crest of the hill and when the two cars were respectively 155 and 100 feet apart. Three were taken from the front seat and through the windshield of a 1955 Chevrolet, looking east down the road from near the crest of the hill. The fourth shows the reverse view; that is, it was taken through the windshield of a Volkswagen looking ahead (west) on the road as both cars approached the crest of the hill. In essence, the complaint is that the photographs, being posed, were not properly identified as representing the locations of the defendants' vehicles at the time of or immediately preceding the acci-

dent, and that the court "erred in refusing to instruct the jury that said photographs were not intended to reflect the positions or locations of defendants' automobiles," as requested by Burton. Boydston, who identified the photographs, and who was present when they were taken, stated that they represented the approximate location of both cars on the day of the accident, but did not pretend to state their exact locations were shown. The position of the Volkswagen in the photograph appears to be farther to the south or wrong side of the road than as indicated by the oral testimony; but Boydston himself stated that the Volkswagen's location at the time of the accident was "possibly a foot" farther to the north than as shown by the photographs. Burton's real complaint seems to be based on what the photographs show with respect to the car's position laterally rather than longitudinally on the road, whereas their purpose was (as stated by counsel in offering them) to show the view that each driver would have, one of the other. The discrepancy, if such it was, in showing the car's lateral position would not be of sufficient gravity to warrant their exclusion.

■ Burton renews the objection made by his counsel, as well as that of his co-defendant's counsel, to the admission of plaintiff's Exhibits 11 and 12, which were color transparencies showing the peg which had been driven into plaintiff's leg for the purpose of attaching traction, and the traction device attached to it, on the ground "that the same were inflammatory and prejudicial, and that there was no showing that they accurately portrayed the matters they showed." Plaintiff's own testimony negates the second of the foregoing grounds, as these excerpts show: "Q. Mrs. Boydston, do these slides, Plaintiff's Exhibits 11 and 12, fairly and accurately represent the traction and the way it was applied to your leg as you were there in the hospital? A. Yes, it does. Q. Now there is red, some red material at the point where. this pin is inserted. I want you to state whether that is some kind of medicine, mercurochrome or

something like that. A. Yes. Q. Rather than blood? A. Yes, it is. Q. You are not saying that is blood there, are you? A. This is taken a couple of weeks, a week to a week and a half afterwards, that's merthiolate or something." The point rests, then, on the first ground, i. e., that such transparencies were "inflammatory and prejudicial." The two authorities cited are Faught v. Washam (Mo.), 329 S.W.2d 588, and Kickham v. Carter (Mo.), 314 S.W.2d 902. Faught does not interdict the use of color photographs or transparencies as such. It gave express approval (which we now reaffirm) to the use of colored photographs under the same limitations and restrictions as are applicable to black and white photographs. Inhering in the quality of the photographs there under scrutiny was that of a distinct want of natural color renditioning both as to parts affected and background as well, and this was so pronounced or distorted as to make their probable inflammatory and prejudicial effect outweigh their probative value. Such is not the situation here. While no witness testified that the color renditioning is natural and not distorted, such is the fact, as disclosed upon the face of the transparencies themselves. The subject matter portrayed is not of such inflammatory or prejudicial nature as would justify the view that the court abused its discretion in admitting them. Kickham v. Carter, supra, is not apposite, it having dealt with an aggravated situation, for which the trial court had granted a new trial.

■ Burton assigns error in the giving of instruction No. 4 for the reason that the instruction "when read together with Boydston's [sole cause] Instruction No. 15, is misleading, misdirects the jury, and permits the jury to find against defendant-appellant Burton upon a ground not pleaded by plaintiff nor submitted in plaintiff's instructions." In the very recent case of Coffman v. St. Louis-San Francisco Ry. Co., Mo., 378 S.W.2d 583, the same type of instructions as Nos. 4 and 15, referred to above, were given, and the same contentions with

respect to them were urged on that appeal as are made in the present point. It is doubtful if two cases could bear greater similarity to each other, either as to the basic point made or the underlying reasons therefor. In this they are so closely akin as to be indistinguishable. The ruling in Coffman was adverse to the contention now made by Burton. It would serve no useful purpose to further develop the point because on the authority of Coffman, the present assignment would have to be, and it is, overruled.

■ The remaining question is that raised by defendants' claim that the verdict is excessive. At the time the accident occurred plaintiff was 21 years old and had only recently returned to Platte County after spending nearly a year in Germany with her soldier husband. Previously, she had been in good health, and participated in athletics, having played basketball during all four of her high school years. She also did horseback riding and water skiing. When the cars collided, plaintiff was thrown forward in the car and she struck her head on the windshield, breaking it, and causing a cut on the forehead an inch to an inch and a half in length which bled profusely and required stitches. But her most serious injury was a comminuted fracture of the right acetabulum (or socket of the hip joint which receives the femur or thigh bone) and a dislocation of the head or ball of the femur or thigh bone as complicated by an associated partial paralysis of the sciatic nerve and the resulting foot drop referred to hereinafter.

Plaintiff's orthopedic surgeon, Dr. Otis E. James, Jr., testified that his initial examination disclosed swelling and deformity of the right hip, numbness of the leg and foot with weakness and difficulty in raising the foot; that X-rays showed a fracture dislocation of the hip joint. After the dislocation was reduced by manipulating the hip and returning the ball of the thigh bone into the socket, X-rays showed fragments of the fractured socket had returned to fairly good alignment. The patient was then placed in skeletal traction, which involved drilling through and inserting a pin in the tibia in such a way that "we could attach a bow to it and then apply a strong amount [30 pounds] of traction in a longitudinal plane." The displacement of the ball of the femur "probably wasn't over a half to three quarters of an inch." The sciatic nerve leaves the inside of the pelvis at about the level where the fracture and dislocation occurred, and Dr. James was of the opinion that hemorrhage from the fracture or possibly one of the bone fragments came in contact with the sciatic nerve or came close enough to bruise it or injure it. The patient remained in traction from four to six weeks. She was then about six months pregnant, and consultation was had with an obstetrician, who, while plaintiff was still in traction, watched and treated a kidney or bladder infection that had developed.

Dr. Forsythe, a neurosurgeon, was called in consultation on account of the patient's loss of sensation in and inability to lift the foot. Upon examination, he concluded "that the hamstring muscles or the muscles in the back of the thigh were intact, the muscles that pull the foot toward the floor were intact but the muscles that lift the foot up off of the floor, as well as the toes off of the floor, were paralyzed. I felt at that time that Mrs. Boydston had a partial paralysis of the sciatic nerve, a division of the sciatic nerve known as the perineal nerve." About a week before plaintiff left the hospital, Dr. Forsythe performed an exploratory operation to determine whether the nerve had been either severed, severely bruised, or stretched and torn. The leg was laid open on the side and at the back near the level of the knee, and the nerve exposed in that area. To the naked eye the nerve was all right, but tests by an electric device known as a stimulator showed the nerve failed to carry the stimulus or electric current applied to it; that is, it did not react or reacted poorly, which, in lay language, means she had a partial paralysis of the sciatic

nerve, and this, in the doctor's opinion, as a result of the collision. He was of the further opinion that her condition (as improved by reason of a subsequent tendon transfer operation a year later) is permanent, and "that she can probably expect no further return [of function] as far as the nerve itself is concerned."

The subsequent tendon transfer operation just referred to was performed by Dr. James in May, 1960, in this manner: He exposed the tendon that goes to the great toe and transferred it from that region underneath the skin and through a second incision into the bone of the first metatarsal and reattached it. Having thereby eliminnated the ability to raise the toe with one of its major tendons, it was necessary to fuse or stiffen the joint of the great toe so that the remaining smaller muscle could still give it some ability to lift the toe. This was done by destroying the cartilaginous surfaces of the joint and transfixing it with a steel wire, which was removed in about six weeks. As a result, plaintiff has a permanent stiffening of the big toe, and also a permanent weakness or partial destruction of her ability to lift her big toe. Although benefited as a result of the operation by some increase in her ability to raise her right foot, it is less than in her left foot and will continue so to be during the rest of her life. The doctor was of the opinion that the conditions he found when he first saw her, and those described by him to the jury resulted from the collision; that the partial paralysis is permanent, and will probably remain essentially the same; that her weakness of dorsiflexion is permanent, making the foot and ankle less stable, and might possibly cause a wobbly ankle, and difficulty in wearing high heels as presently worn by women. There is some permanent limitation of rotation of the hip, which limitation may increase throughout her life because of what, in his opinion, appears to be a progressive type of traumatic arthritis developing in the hip joint. If this arthritis continues to progress (and the witness was of the opinion that it was "most likely" to

do so), it will cause increased pain for the rest of her life not only in the hip, but also in her back, and, of course, a decrease in the motion of the joint. This can be corrected only by fusion of the hip joint (which would prevent her bending her leg at the hip joint) or insertion of an artificial cup in the hip socket; but if either of these operations is 100% successful, the patient is still left "crippled," said the witness. At the time of trial he was not recommending any further surgical intervention. The femur itself was not fractured, only the socket, and those fractures had healed more than a year prior to trial. The doctor's X-rays showed no evidence of any change or progression in the arthritic condition of the hip joint in the six months preceding November 16, 1960, and he had not seen or X-rayed her since that date.

For a period of about six months after leaving the hospital plaintiff wore a leather and metal leg brace extending from foot to hip. She testified that she used crutches the first two and a half months, and then after removing the brace and for a very brief time (a week or two) a cane. After she was able to walk without crutches or cane she had "a very definite limp," as she expressed it. In July, some three and a half months after the accident, she gave birth to a normal child and it was a normal birth. After removing the brace and up until the time of trial, there was limitation of motion of the hip joint. She had 64 electrical and therapy treatments at her doctor's office. This continued with decreasing frequency for about one year and did not help the foot drop although the therapy helped the hip motion. Thereafter, she had the operation which improved her ability to raise her right foot and enabled her to walk "fairly decent" but with a slight limp.

She testified that she had not used a crutch, cane or brace since about six months after the accident and that it was about one year after the accident before her back bothered her badly enough that she went to see a doctor about it. The operation performed on her foot corrected the foot drop

sufficiently so that the foot does not drag and no longer causes her to stumble as it had before the operation. She had had kidney trouble prior to the accident as well as since the accident, and it is only if she moves her hip wrong or is on her feet too long or is out in the cold weather that her hip bothers her. When her hip bothers her, it is just a momentary pain that goes right away except that perhaps once a month or once every six weeks, the pain has not disappeared right away and has caused her to go to bed and use a heating pad; other than that, she is able to walk and get around. Two months after her baby was born (in September 1959) and about six months after the accident, she started taking care of her brother's child as well as her own and continued to do so until she had the foot operation and after recovering from that, up until she got an office job. She was confined to the hospital four days with the foot operation and was on crutches with a cast on her foot for four to six weeks thereafter.

Before going to Germany plaintiff had been employed about a year and a half by TWA doing IBM work, and before that she did the same kind of work for BMA. In the fall before the trial she was employed from the last of October or first of November until the following January 20th at "Statistical Tabulating" earning $1.75 an hour for a 40-hour week. She testified she gave up this employment because she would be "real tired and real nervous" and wasn't able to handle her infant daughter when she got home. There was no evidence that this condition was permanent, nor, for that matter, that it resulted directly from the accident. In any event, no claim for loss of earnings was submitted, and the same is true with respect to hospital and medical expenses or other elements of special damages.

Defendant Burton called a witness from the personnel department of the company for which plaintiff worked for about two months prior to January, 1961, who testified that plaintiff notified the company she was going to stop working temporarily due to pregnancy and that they still regarded her as a part-time employee subject to being rehired when she was over her pregnancy.

We have been cited to various cases in support of, and in opposition to the claim of excessiveness, all of which have been examined, but we have found none where the injuries are very closely comparable. The considerations affecting this question are so familiar and well established as to make it unnecessary to repeat them there, and we shall not do so. While plaintiff's injuries are admittedly severe and permanent, we are of the opinion that their nature and extent as outlined above do not and cannot justify the amount awarded, and that such sum is excessive by at least $20,000. Therefore, if plaintiff will, within 15 days, enter a remittitur of $20,000, the judgment will be affirmed in the sum of $40,000; otherwise, it will be reversed and the cause remanded.

All of the Judges concur.