Lonnie Dale CRANE, Respondent,

v.

Lionel Lansford NORTHUP, Appellant.

No. 51933.

Supreme Court of Missouri, Division No. 2.

April 10, 1967.

Scott O. Wright, Columbia, for respondent, Brown, Wright & Willbrand, Columbia, of counsel.

Terence C. Porter, Columbia, for appellant, Welliver, Porter & Cleaveland, Columbia, of counsel.

BARRETT, Commissioner.

This action for damages for personal injuries arose out of a station wagon-motorcycle collision at the intersection of Business Loop 70 East and Business Route 63 South as they existed in Columbia on April 14, 1964. At 7:48 p. m. on April 14, 1964, the plaintiff, Lonnie Crane, lights on, was operating a 1962 Triumph motorcycle with the traffic lights in the right-hand lane of Highway 40, traveling west at a speed of 20 to 25 miles an hour. As Lonnie approached but before he entered the intersection the defendant Northup, operating a 1960 Ford station wagon made a left turn into the intersection and not seeing Lonnie negligently drove the station wagon into the side of the motorcycle pinning Lonnie's leg between the two vehicles. In this action to recover $110,000 damages for his negligently inflicted injuries a jury returned a verdict for $45,000 and the defendant Northup has appealed presenting the single assignment of error that the verdict is excessive and as "a condition to the affirmance of this judgment a substantial remittitur should be ordered."

Lonnie's injuries all resulted from this collision and are interrelated but fall conveniently into three separate categories, his left leg, his left foot and emotional sexual inadequacy.

Referring briefly and to the medical evidence only, Dr. McElroy first saw Lonnie on a stretcher in emergency, and even there it was obvious that he had "a severe compounding wound of his left leg. His bones were protruding—the main bone, the tibia had protruded through the skin. There were extensive lacerations and wounds involving the leg, * * *. He also had an impaired circulation. His foot below the fracture site of the leg was cyanotic or blue, with no pulsation." After X-rays revealing a complete separation of the ends of the tibia and a fracture of both bones extending through the soft tissue and his foot "turned around ninety degrees" the fractures were reduced with two "transfixing wires" and a large cast, hip to toes, was applied. Drains were inserted in the soft-tissue wounds, circulation was restored, no infection developed and the fractures "healed slowly." Lonnie was hospitalized April 14, 1964 and released in his long cast on May 2. He wore the long cast ten months, using crutches. After ten months his leg was placed in a short cast, knee to toes, and for another month he used crutches. In conclusion, as to the leg injury only, Dr. McElroy said, "We haven't got a normal leg, but we have got a good leg. It is a good usable leg. * * * First, he has got a leg that he can walk on. It is a straight leg. * * * Now, our problem—that doesn't mean it is a normal leg, that he can go out and run up and down the street or be a track man or a football man. He has some damage to the soft tissue. He has scar formation of the leg, due to the extensive lacerating wounds and injuries he received." As to the leg the doctor said, "He will have some swelling of that * * * he has movement of his knee and a useful leg, but not a normal one. * * * He will have some permanent damage. The scars are permanent. He will have some swelling. That will be intermittent. And he will have it. Then he will be restricted from excessive use be-

cause of some soreness of the muscles. This is all due to scarring and discomfort."

After his leg had been in the long cast for four months or more, in August while the cast was being changed, it was discovered that his left foot was also seriously injured, fractures with "malalignment of the toes and the ball of the foot." It was not deemed advisable at that time to do anything about the foot injury until further progress with the leg injury. X-rays of the foot revealed malalignment of the fourth toe, a fracture of the second metatarsal, a "fracture dislocation of the third, a fracture dislocation of the fourth, and what appeared to be a fracture of the fifth. Actually there is a dislocation there," resulting in overriding. On January 29, 1965, Lonnie was rehospitalized and the fourth metatarsal was removed. Then in September there was further orthopedic surgery and the fifth metatarsal was removed, and "I took off the toe" leaving the soft tissue. In conclusion as to the foot the doctor said, "Our problem of the foot is greater. We have some discomfort. We have some deformity. We have a loss of one toe, with a fourth toe, which is there but serving no useful purpose, except to try to fill out the front of the shoe. We are getting a little shift or valgus deformity. That is a lateral shift of the great toe." Because of the lateral shift of the great toe, in three months to a year, another operation will probably be necessary, "removal of the prominence here, bring the toe back to a more satisfactory position, take and transplant one tendon in the foot here. That brings the toe over, and then let it heal in that position." Further describing, the doctor said, "The foot looks good. It is a foot, but it is not a normal foot. In walking his foot gets down pretty well. His arch is pretty well maintained, but you will notice that he walks more on this type of inside and toe is going in more. * * * So we are getting a lateral drift of the big toe and we are getting a bunion deformity." The foot was put in a brace and cuff to the knee and now he gets along

with an arch support in the left shoe. As to the future, the doctor was of the opinion that Lonnie could carry on his profession of a carpenter but "He will have some limitation of use of this extremity. This can mainly, on certain types of ground and certain elevations that he has to work on— he will have to be extremely careful. Ladder work will create a problem for him. Walking on a roof will create a problem for him. Walking on the side of a hill. Now he will get along on straight ground very well or smooth floors. But he will have problems. In other words, he had some permanent disability." At this juncture it should be noted that Lonnie is yet under Dr. McElroy's care; "For an indefinite period of time, I will see him."

Lonnie, age 28, was married in 1958 and he and his wife have a daughter age four. An internist, corroborated by Lonnie's wife, said that as a result of his injury, the long periods of treatment and confinement of the leg in a cast he was "quite depressed, emotionally licked, tuned down" which resulted in "difficulty in his social interrelations with others, with his family, by an emotion instability, by difficulty in performing his marital activities, inability rather than difficulty. * * * Well, I think that prolonged illness, the prolonged inability to provide for his family, the need to rely on his wife's earnings is certainly a blow to his male pride in being able to provide adequately for his family. His impotency may have been part of this, part of the result of this. The fact that he did respond to male hormones (testosterene linguets) so markedly in the improved healing may possibly point to an initial deficiency in that area. However, this particular aspect, the sexual aspect, did not improve on the administration of the male hormone. This is part of the very well-known situation with failure in males, the failure to have capability to carry on and terminate intercourse, will lead to anticipation of failure the next time, in other words, a psychologic block is interposed there which makes a man anticipate failure,

therefore he will fail, and the third and fourth time would be more severe until a man simply absolutely considers himself incapable. It's been stated by many authorities that much of the sexual capacity in humans is purely on an emotional basis."

This subject is elaborated on and given separate attention because the doctor did not say and there is no proof that Lonnie's sexual inadequacy is permanent. And obviously his condition in this respect is not due to a physical injury to the sex organs resulting in a permanent physical injury and permanent impotency as in Walton v. United States Steel Corporation, Mo., 362 S.W.2d 617; Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S.W.2d 119; and Ramey v. Missouri Pacific R. Co., 323 Mo. 662, 21 S.W.2d 873. In short, this record does not satisfactorily establish permanent impotency (Highfill v. City of Independence, Mo., 189 S.W. 801, 804–805) although the fact as testified to by the internist, "that he was afflicted with traumatic neurashthenia and further testified that such a condition could cause the loss of sexual power" (Morris v. Union Depot Bridge & Terminal R. Co., 320 Mo. 371, 379, 8 S.W.2d 11, 14) is an injury the jury of necessity and properly considered in arriving at the final award.

Lonnie is a high school graduate and, as stated, a carpenter. After getting rid of his leg brace in March 1965, he went to work for a contractor but his employer said that, because it was difficult for him to do a lot of things, at a pay scale of $2.25 an hour rather than the regular scale of $2.75 "an hour or more." Lonnie has difficulty climbing ladders and walking on roofs or rough terrain and his foot swells but except for time off for the foot operations has worked steadily. He is often more irritable and cross than formerly.

While in the casts and before removal of the brace Lonnie was off from work for fifty weeks and therefore lost wages of $4970.00. He owes Dr. McElroy $815.00,

Boone County Hospital $1105.90, Dr. Laura Walters $20.00, Dr. John Walters $50.00, he has paid $142.90 for braces, crutches and supports and he owes $5.00 for ambulance, $55.00 to Dr. Shewe, $16.75 nursing and X-rays $70.00, thus there is a medical expense of $2280.55 and a total of special damages of $7250.55 (and this disregards any future loss due to diminished pay). Thus deducting the special damages there is an award for injuries of $37,749.45.

As indicated Lonnie's injuries and losses are not comparable to the far more extensive injuries in Walton v. United States Steel, supra. On the other hand they are much more extensive than in some of the cases relied on by the respondent, as in Humes v. Salerno, Mo., 351 S.W.2d 749, which involved a leg injury only, or Ward v. City National Bank & Trust Co. of K. C., Mo., 379 S.W.2d 614, which involved but a foot and ankle. The injuries and losses are not comparable to Boehm v. St. Louis Public Service Co., Mo., 368 S.W.2d 361, in which the court points out that there was no injury other than "a permanently damaged and distorted leg and a permanent limp." In that case it was also pointed out, unlike in this one, that "Pins, wires, plates, traction, braces and crutches do not figure in his case," and, since plaintiff was a girl of eleven, there was no loss of earnings and no medical expense and "no demonstrated loss or diminution of earning power; no demonstrated disability to earn a living or pursue normal household duties." And so a verdict of $32,500.00, reduced by the trial court from a $55,000.00 award, was further reduced by $7500.00 in this court to $25,000.00 in 1963. But by comparison of injuries only, of that case and this, excluding special damages, there is a difference in awards of but $12,749.45 and here, of course, there is more than a leg injury. As has been said repeatedly, there is no precise formula in gauging excessiveness of verdicts, each case of necessity depends on its own facts and in observing some degree of uniformity of awards for comparable in-

juries "Consideration must be given the nature and extent of the injuries and losses, plaintiff's age and his diminished earning capacity, if any, the changing economic factors and the amount of compensation awarded and approved in cases similar or of fairly comparable injuries. The ultimate test of excessiveness or of inadequacy of an award is what will fairly and reasonably compensate for the injuries sustained." Parlow v. Carson-Union-May-Stern Co., Mo., 310 S.W.2d 877, 885. The "changing economic factors" alone are sufficient to distinguish Glowacki v. Holste, Mo., 295 S.W.2d 135, decided more than ten years ago, in 1956. Needless to say, no case involving precisely similar injuries has been cited or found, in Swinger v. Bell, Mo., 373 S.W.2d 30, relied on by the respondent, there were special damages of over $10,000.00. The injury was to the right femur, with a permanent loss of motion in the knee, a limitation of 30 to 40%, and a permanent limp and in 1963 it was held that a $30,000.00 verdict was not excessive. While the injuries and losses here are more numerous than in the Swinger case, there is not here the impairment of function and loss of use of members as there. Over three years have passed and there has been an enormous increase in the cost of living and a further decline in the value of the dollar but it would not equal $10,000.00 in a $45,000.00 judgment. To conclude, with a view to some degree of uniformity on the one hand and just compensation for actual losses and injury on the other hand, it rather definitely appears, considering all the indicated factors, that this judgment is excessive in the sum of $10,000.00. If, therefore, the plaintiff will, within fifteen days from the date of the filing of this opinion, file in this court a remittitur of $10,000.00, the judgment will stand affirmed as of the date of its rendition for $35,000.00. Otherwise, the judgment is reversed and the cause remanded.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.