**Ray Curtis SANDERS and Betty Sanders, Plaintiffs-Respondents,**

v.

**H & S MOTOR FREIGHT, INC., a corporation, Defendant-Appellant.**

No. 36229.

Missouri Court of Appeals,
St. Louis District,
Division One.

July 29, 1975.

---

1. This "fitness" conceivably could be measured by the judge's estimation of its credibility.

Keyes & Hearne, John L. Hearne, Jefferson City, for appellant.

Gray & Ritter, St. Louis, for respondent.

RENDLEN, Judge.

H & S Motor Freight, Inc., defendant below, appeals the $150,000 judgment entered on a verdict for injuries to plaintiff Ray Sanders. His wife Betty Sanders received a verdict of $30,000 for loss of consortium but filed a voluntary remittitur reducing her award to $17,500 and no appeal is taken from that judgment. The action arose from a two-truck accident, one driven by plaintiff Ray Sanders and the other by defendant's employee Claude Hayes.

█ We consider three assignments of error: (1) the trial court erred in sustaining plaintiff's objection to defendant's introduction of a photocopied document intended to impeach defendant's own witness; (2) Ray Sanders' judgment was grossly excessive; and (3) the excessive verdict demonstrated bias and prejudice of the jury. Defendant further asserts there was a failure of proof as to Claude Hayes' employment with H & S Motor Freight. This point, not raised in defendant's motion for new trial as required by Rule 78.07, V.A.M.R. (formerly Rule 79.03), is not preserved for appeal and there is no basis for its consideration as plain error. We affirm.

On September 15, 1971, tractor-trailer trucks driven by plaintiff Ray Sanders and defendant's employee Claude Hayes simultaneously attempted to cross a bridge from opposite directions on Highway 52, an east-west road in Miller County. Plaintiff's truck had passed an automobile driven by John Houston somewhat to the west but had returned to its own lane before reaching the bridge. As defendant's truck entered the bridge it jackknifed four or five feet into plaintiff's lane causing the collision in which the left front of plaintiff's vehicle was struck by the back wheels of the tractor and the left front of defendant's trailer. Plaintiff, rendered unconscious by the crash, did not "come to" until in the hospital at Jefferson City where he was treated for extensive injuries. Defendant does not challenge the sufficiency of the evidence concerning its driver's negligence but complains of the verdict amount.

The facts giving rise to defendant's first contention of error occurred when its counsel called John Houston as a witness for the defense. Contrary to defendant's expectations, Houston testified plaintiff Ray Sanders was on his proper side of the highway immediately prior to the collision. Counsel, out of the jury's hearing, told the court he had not interviewed the witness prior to trial but had a statement signed by Houston to the effect that Sanders' truck was straddling the center line at the time of impact. In view of the contrary testimony, defendant's counsel claimed surprise and requested permission to use the written statement to refresh the witness' recollection, or apparently for impeachment. Still outside the jury's hearing voir dire examination of Houston was undertaken, at which time he was presented a *photocopy* (defendant's exhibit E–1) and a *carbon copy* (defendant's exhibit E–2) of the three-page handwritten statement.[1] During voir dire plaintiff's attorney objected to use of the photocopy (defendant's exhibit E–1) arguing there was no evidence it was taken from the original document. Because there was no explanation of the unavailability of the original, the objection was sustained.

---

1. Each of the photocopied pages (defendant's exhibit E–1) bore Houston's signature at the bottom as did the third page of the carbon copy (defendant's exhibit E–2), but the first two carbon pages bore only a few letters of what might have been a signature.

The absence of signatures on the first two pages were attributed to slippage of the carbon paper while being written. The statement, except for signatures, was not in Houston's handwriting.

The defense continued its interrogation of Houston to establish the authenticity of both exhibits. Though the witness denied having made certain statements appearing in the exhibit, he admitted the signatures were his. It is not clear from the record if Houston, when testifying, was examining the photocopy, the carbon copy or both, but he acknowledged having signed the original. Plaintiff then withdrew his objection to the statement (apparently referring to the carbon copy) but when the jury returned he renewed his objection to the photocopy (defendant's exhibit E–1) which the court again sustained as not the best evidence. Though plaintiff made no objection to admission of the carbon copy (defendant's exhibit E–2), defense counsel did not avail himself of the opportunity to use that exhibit; instead he excused Houston from the stand and in the jury's presence called witness Harold Punches to lay a foundation for the use of the photocopy.

On direct examination by defendant, Punches testified he was branch claim manager with Truck Insurance Exchange, that he hired the investigator who took the original statement of Houston, that the photocopy was a true copy of the original made at the "Exchange" claims office and the original could not be located. On cross examination Punches stated that "Exchange" carried the insurance on defendant's truck and had a financial interest in the outcome of the suit, to which defendant made no objection.

■ Recalling Houston, defendant confronted him with the *photocopy* and read it into the record. Though permitted finally to use exhibit E–1 for impeachment of its own witness, defendant contends the statement was collateral to the issues on trial and hence did not fall under the best evidence rule per *Aviation Enterprises, Inc. v. Cline*, 395 S.W.2d 306 (Mo.App.1965). Defendant claimed it was then prejudiced when forced to lay a foundation leading to disclosure of insurance coverage. However, if it is found the trial court erred, the error is reversible only if there is prejudice to the complaining party. *Kennedy v. Tallent*, 492 S.W.2d 33, 39[9] (Mo.App.1973). We find no such prejudice.

■ Defendant contends the ruling of the trial court made it necessary to lay a foundation for exhibit E–1; however, defendant was not required to do so in the presence of the jury. Proof of loss or destruction of primary evidence is a question solely for the court and not the jury. *Garrett v. Terminal R. Ass'n of St. Louis*, 259 S.W.2d 807, 811[1] (Mo.1953); *Scrivner v. American Car & Foundry Co.*, 330 Mo. 408, 50 S.W.2d 1001, 1008[7] (banc 1932). When a question is one of law to be decided by the court, the evidence may properly be submitted out of the hearing of the jury. *Hutchinson v. Steinke*, 353 S.W.2d 137, 144[6] (Mo.App.1962). Defendant did not request the jury be withdrawn during the testimony of Punches and a party cannot argue as error an incident of his own creation. *Benjamin v. Benjamin*, 370 S.W.2d 639, 643[11] (Mo.App.1963). Whether this was done by mistake or as a matter of trial strategy, defendant opted to examine the witness in the jury's presence. Notwithstanding plaintiff's withdrawal of his objection to defendant's exhibit E–2, defendant elected not to use the carbon copy for impeachment though this would have obviated the necessity of calling Punches. "[A] party will not be heard to complain of alleged error in which, by his own conduct at the trial, he joined or acquiesced." *Benjamin v. Benjamin, supra* at 643[11]; *Taylor v. Cleveland C., C. & St. L. Ry. Co.*, 333 Mo. 650, 63 S.W.2d 69, 75[15] (1933). Defendant's first assignment of error is without merit.

■ Defendant next contends the $150,000 verdict is grossly excessive and the trial court erred in overruling its motion for remittitur. There is no precise formula for determining the amount of damages in a personal injury case, but a recovery is measured by that which is "fair and reasonable compensation" sufficient to provide a liveli-

hood and care and comforts to ameliorate the suffering of the victim. *Moore v. Ready Mixed Concrete Co.,* 329 S.W.2d 14, 30[14] (Mo. banc 1959). The question of excessive jury awards rests on the facts of each particular case, *Wren v. St. Louis Public Service Co.,* 355 S.W.2d 365, 374[14] (Mo. App.1962), giving consideration to the nature and extent of the injuries and losses, plaintiff's age, his diminished earning capacity and changing economic factors, all weighed in light of the ultimate test of fairness and reasonableness. *Crane v. Northup,* 413 S.W.2d 190, 194 (Mo.1967); *Painter v. Knaus Truck Lines, Inc.,* 375 S.W.2d 19, 26[9] (Mo.1964). We also look to other cases involving injuries similar to those suffered by plaintiff so that there is reasonable uniformity as to the amounts of verdicts. *Moore v. Ready Mixed Concrete Co., supra* at 31.

"Although an appellate court properly may determine, as a matter of law, whether the verdict under review is in excess of the maximum amount which the evidence in the case would support * * *, the assessment of damages is peculiarly and primarily the function of the jury, whose duty it is to award such sum as reasonably will compensate plaintiff * * * and, the appellate power to interfere with and reduce a verdict is exercised with caution * * * and only where the amount of the verdict is manifestly unjust. * * * In determining whether a verdict is excessive, we do not weigh the evidence but * * * consider it in the light most favorable to plaintiff and the verdict, disregarding defendants' contradictory or unfavorable evidence." *Hart v. City of Butler,* 393 S.W.2d 568, 580[19, 20] (Mo.1965).

Plaintiff Ray Sanders, 34 years of age when injured, had experience as a factory worker, general laborer and truck driver. In the accident he suffered a fracture of the mid-shaft of the right femur which was displaced about 2 inches, tearing the surrounding muscle, the peritoneum and causing bleeding in the leg. He also sustained a severe comminuted fracture of the left femur near and into the knee joint through the superior condyle of the femur. This injury was described by the treating and the examining physicians as a complicated multiple fracture with numerous bone fragments. Plaintiff also suffered a dislocation of the distal joint of the left big toe, a pneumothorax or partial collapse of the right lung, rib fractures on the right and various lacerations, including a cut on the left side of the head, a two-inch cut in his right thigh and a five-inch laceration of the left heel, the latter two requiring sutures. Pins were inserted in both legs for traction and a closed thoracotomy was performed on the right chest by insertion of a tube and other procedures to relieve the pneumothorax. The fracture of the right femur was repaired by open reduction and insertion of a steel rod in the marrow cavity, accomplished by driving the rod through the upper portion of the femur into the buttocks and on alignment of the fractured parts, driving it down through the length of the bone. The comminuted fracture of the left femur was repaired by open reduction and internal fixation with a Messner plate and multiple bolts, nuts and screws to join the numerous fragments.

Sanders was hospitalized on four occasions. The initial stay was September 15 through October 14, 1971, during which much of the surgical and other treatment was administered. In pin traction prior to the major surgery to his legs, he remained in the hospital 19 days after those corrective procedures. Readmitted 15 days later, plaintiff remained for a week with pneumonia of the right lung. Experiencing continuous pain in the left wrist, he was admitted for a third hospitalization December 6, 1971, at which time a transverse navicular fracture of the left wrist was discovered and a cast applied. He was dismissed from this stay December 8. The fourth hospitalization, January 17 through 22, 1972, was for physiotherapy to correct muscular weakness of the legs and assist in regaining his ability to walk. Prior to his January 22, 1972,

release, plaintiff had been unable to walk and when not in the hospital was confined at home in bed. On completion of therapy he used crutches through March or April, 1972, and a cane until September. The left femoral fracture was not completely healed more than one year following the injury.

Prior to the accident plaintiff had been employed by Waites Farm and Feed Supply and though hampered by his injuries, he returned there October 1, 1972, 54 weeks after the accident. Plaintiff now walks with difficulty, has a decided limp, and while able to operate a truck, can no longer drive through on longer trips; he must stop and rest due to pains in his legs. It is also necessary for a helper to ride or work with him to tie the tarpaulin on the top of the truck, load turkeys, stack feed bags, carry sacks of grain or similar loads since plaintiff unassisted is not able to do the necessary climbing, carrying or lifting. Defendant admits plaintiff lost $8,370 in wages between the date of the accident and his return to work October 1, 1972. Since his return he has received $120–$130 per week as compared to $160–$170 per week prior to the accident. He works less now and because of the injuries misses 7 to 8 days per month from the job.[2] His reduced hours resulted in lost wages of $2,720 from October 1, 1972, until the time of trial in January of 1974. Medical expenses at the time of trial were $6,820.75, which with lost earnings total $17,910.75. Plaintiff was 36 years of age at the time of trial in January of 1974 and if his condition permits him to work at his present rate until 65 (a total of 29 years) with earnings diminished approximately $40 per week, his wage loss, by conservative estimate, would exceed $60,000. If his condition deteriorates, and the medical testimony indicates it will not improve, this wage loss could increase. Thus his special damages to date, coupled with reasonably anticipated loss of earnings, are more than $77,900.

The injuries produced permanent sequelae, rendering plaintiff unable to work as before, limiting his ability to walk or climb because, as he testified, his legs "won't bend" properly without hurting. The midshaft fracture and distortion of bone fragments in the right femur produced torn muscles and soft tissue damage at the fracture site with resulting scar tissue, diminished stamina and weakness in that leg. Because of the fractures in the left leg involving the superior condyle of the femur and the knee joint, arthritic formations or spurring have appeared in the joint under the kneecap. The presence of this condition in late 1972 confirmed the original prediction that plaintiff would experience stiffness, swelling and pain in the joint which would increase with age. These arthritic changes are not ordinary degenerative arthritis seen in advancing years but instead traumatic arthritis due to the irregularity or granulation in the load bearing surface of the joint. It was compared to "throwing sand into a roller bearing". The joint is affected by a decrease in the circulation and deposits of scar tissue in the joint at the fracture, permanently affecting the articular surfaces. From the tenor of the

2. Plaintiff is now and was before the accident paid on both a mileage and an hourly basis. His hourly rate has risen from $1.60 at the time of the accident to $2.00 per hour at trial but the mileage has remained at $.08 per mile. It is not clear how much of his earnings are from each part of his employment but the mileage is earned under an arrangement for truck rental involving plaintiff and his son-in-law as drivers. This arrangement was in the nature of "contract hauling" and "rental" is reflected as part of plaintiff's earnings. Defendant in its brief erroneously asserts the record reflects plaintiff drove approximately 100,000 miles in 1973 and suggests most if not all of plaintiff's earnings that year were from that source. From this defendant concludes plaintiff earns more since the accident than before. The record does not so show nor is defendant's position supported by inference. As previously stated, since plaintiff's earnings from Waites are derived from a variety of activities, the evidence does not, as defendant suggests, conclusively refute plaintiff's testimony of diminished earnings. Defendant seeks to take as true the evidence most favorable to its view and would have us discount or ignore plaintiff's contrary testimony. This we may not do.

medical testimony, plaintiff has attained maximum recovery, can expect no further improvement and if his condition changes it will be for the worse. The doctors further noted that one of the screws inserted in the left knee protrudes, producing sensitivity and any bump of the knee will cause pain. Plaintiff testified that bumps to the inside of his knee in fact cause severe pain and for some time thereafter he cannot walk or stand on his leg. Though difficult to describe, plaintiff testified that it feels like a pin or needle sticking in a raw sore. From September, 1971, until January, 1972, he traveled to and from the hospital by ambulance. Plaintiff returned to work when permitted by the doctor but when his leg hurts it is necessary to stop, and even those things which he can do take him longer than before.

Defendant cites numerous cases in support of its plea for remittitur. In all but four the appellate court affirmed the verdict and those in which remittiturs were ordered are sufficiently dissimilar not to be controlling here. *Crane v. Northup*, 413 S.W.2d 190 (Mo.1967), cited by defendant, involves a 28 year old carpenter who suffered lower left leg and foot injuries and emotional sexual inadequacy. There was no evidence that plaintiff's sexual inadequacy was permanent and medical testimony demonstrated that while the lower leg was damaged and not normal, plaintiff had movement of his knee and his leg was a "good usable leg". *Crane* at 191. There was loss of one toe and injury to another. While the foot was not normal, "[t]he foot looks good . . . In walking his foot gets down pretty well." *Crane* at 192. The evidence was not clear as to loss or extent of future earnings. The nature of the permanent injuries and their disabling effect and anticipated loss in *Crane* are not comparable to the far more extensive injuries in the case at bar.

The court in *Crane* distinguished two of the cases relied on by defendant here: *Humes v. Salerno*, 351 S.W.2d 749 (Mo. 1961), and *Boehm v. St. Louis Public Serv-*

*ice Co.*, 368 S.W.2d 361 (Mo.1963). According to the court, the injuries and losses to the plaintiff in *Crane* "are much more extensive" than those involved in either *Humes* or *Boehm*. *Crane* at 193. In *Humes* a 34 year old jockey was bitten on the leg by a horse. The plaintiff sustained some irreversible damage to the leg muscle and the calf of his leg atrophied one inch, causing "some impairment [of] his [capacity] to ride." As the *Crane* court pointed out, the *Humes* case "involved but a foot and ankle." There was evidence of only one month's lost wages and there was no showing of specific loss or reduction of future earning capacity. The distinction in degree and type of injury, vis-a-vis that in the case at bar, is clear.

The injury sustained by the plaintiff in *Boehm,* an 11 year old girl, was "a permanently damaged and distorted leg and a permanent limp." The *Boehm* court points out, however, that "[a]lthough grievous and impressive the injuries do not compare in seriousness with those in many broken leg cases in which large verdicts have been upheld. Pins, wires, plates, traction, braces and crutches do not figure in this case . . . There was no testimony about pain, past, present or future . . . [plaintiff] is able to run, jump, walk, skate and play, although not as hard and fast as previously." *Boehm* at 370[11]. The court further stated, "There is no demonstrated loss or dimunition of earning power; no demonstrated disability to earn a living or pursue normal household duties. No loss of earnings, doctor's and hospital bills, or other items of special damage are to be accounted for in this award." *Boehm* at 370[11].

Defendant's fourth cited case involving remittitur, *Boydston v. Burton*, 379 S.W.2d 536 (Mo.1964), involves a 21 year old female plaintiff who suffered permanent weakness in her big toe, partial paralysis of the right foot and limitation of rotation of the right hip with progressive type of traumatic arthritis in the hip joint. The court points out that the foot was subsequently repaired

considerably improving her ability to raise her foot and enabling her to walk "fairly decent [sic]" but with a slight limp. *Boydston* at 544[9]. Further, the court notes, "[w]hen her hip bothers her, it is just a momentary pain that goes right away except that perhaps once a month or once every six weeks, the pain has not disappeared right away and has caused her to go to bed and use a heating pad; other than that, she is able to walk and get around." *Boydston* at 545[9]. There was no claim for loss of earnings, hospital and medical expenses or other elements of special damages.

█ We note further that defendant cited cases from seven to fourteen years ago. This and dissimilarity in injuries and losses distinguish each of the cases involving remittitur. In considering claims of excessive verdicts, we recognize the constantly eroding purchasing power of the dollar, which as noted in *Zipp v. Gasen's Drug Stores, Inc.*, 449 S.W.2d 612, 623 (Mo.1970), amounted to 20% between 1965 and 1970, and in *Shaffer v. Kansas City Transit, Inc.*, 463 S.W.2d 606, 610[2] (Mo.App.1971), it was estimated that the decline between 1957 and 1971 was in excess of 30%. The rate of decline since 1971 has steadily increased and inflation today has become a major national concern.

In *Woodford v. Illinois Central Gulf R.R. Co.*, 518 S.W.2d 712, 718[14] (Mo.App.1974), this court has summarized the controlling considerations:

> "The factors bearing on whether a verdict is excessive are well known. They are: (1) the nature and extent of plaintiff's injuries, (2) the permanency of plaintiff's injuries, (3) plaintiff's age, (4) examination of cases involving awards for similar injuries, (5) due regard for economic factors (inflation, etc.), and (6) an awareness of the fact that the jury and the trial court had a superior opportunity to appraise plaintiff's injuries . . . It is axiomatic that in reviewing the excessiveness of a verdict, only

the evidence favorable to the plaintiff will be considered."

█ Though we find little mention of pain and suffering in defendant's argument, these factors properly constitute elements of damages for which recovery is allowed, as well as future pain and suffering, provided there is the requisite certainty or probability that such pain and suffering will result. *Hurst v. Chicago, B. & Q. R. Co.*, 280 Mo. 566, 219 S.W. 566, 569[4] (1920); *Clayton v. Metalcrafts Corp.*, 12 S.W.2d 938, 941[5] (Mo.App.1929); 22 Am.Jur.2d Damages §§ 105 and 106, pp. 154–155. The record is replete with evidence of plaintiff's pain and suffering, and though now diminished, it is a ·constant factor in his life, expected to increase with age. It is difficult to assign a dollar figure to pain and suffering since it has no monetary equivalent and damages awarded therefor should, whenever possible, be left to the judgment of the jury, subject only to correction by the courts for abuse. See *Cline v. Carthage Crushed Limestone Co.*, 504 S.W.2d 102, 117–118[17] (Mo.1973). In *Asher v. Griffin*, 342 S.W.2d 255, 261[8] (Mo.App.1961), the court stated: "It is a fundamental rule that an Appellate Court should not disturb a verdict as excessive unless it appears excessive as a matter of law, that is, when the verdict is clearly for an amount in excess of the very most that the proof of damages would reasonably sustain . . . and then only when the verdict is grossly excessive to such a degree that it shocks the conscience of the Court . . ." Moreover, the issue of excessiveness was here submitted to the trial court which refused remittitur, and absent abuse of discretion the judgment of the trial court will not be disturbed on appeal. *Morris v. Israel Bros., Inc.*, 510 S.W.2d 437, 447[13] (Mo.1974).

█ We have carefully reviewed the record as to plaintiff's age, injuries, capacity for gainful employment, erosion of the dollar's purchasing power, pain and suffering, medical expenses, loss of wages and related matters and find the amount of

judgment does not shock the conscience of this court. Although generous, we determine no remittitur is required. *Wren v. St. Louis Public Service Co.*, 355 S.W.2d 365, 374[15] (Mo.App.1962).

Finally, defendant argues the verdict was so grossly excessive it indicates bias and prejudice of the jury requiring a new trial. To establish such claim of prejudice there must be both an excessive verdict and some other improper action or misconduct during trial. *Boehm v. St. Louis Public Service Co., supra* at 369[9, 10]; *Cline v. Carthage Crushed Limestone Co., supra* at 116[17]. Defendant offers as its supporting impropriety the requirement that defendant lay a foundation for introduction of defendant's exhibit E–1. As determined above, there was no prejudice involved in that action of the court and we have found the verdict not excessive. This assignment of error fails.

We have considered plaintiff's contention of res judicata but find it unnecessary to rule the point.

Judgment affirmed.

WEIER, P. J., and DOWD, J., concur.